# THE MERCANTILE TRUST AND DEPOSIT COMPANY, Executor and Trustee,

*vs.*

# J. WILLIAM RODE.

*Authority of Broker—Evidence—Contract of Sale—Evidence of Usage—Hearsay Evidence—Stenographer's Notes— Refreshing Memory—Accord and Satisfaction— Acceptance of Payment.*

On an issue as to the authority of a broker employed by defendant's decedent in 1918, evidence as to his authority in 1917, while originally irrelevant, was made admissible by later testimony of the broker that he was employed by decedent to buy for him "the same as he always had."  p. 369

Where the terms and conditions of a contract of sale, as testified to by the broker who made it, were plain and unambiguous, no evidence of custom or usage was admissible either to corroborate the witness or to control or vary the contract.  p. 370

One is not bound by a usage or custom not shown to have been known to or adopted by him.  p. 370

Error in allowing a question to be asked a witness as to the law of another state, *held* harmless, in view of the fact that the judge told the jury that they need not be bothered about it, and also granted a prayer which effectively neutralized the effect of the answer given by the witness.  p. 371

One who dictated and signed a letter, *held* not entitled to testify that a note book produced by him, purporting to contain his stenographer's notes of the letter, showed that certain figures in the letter were the result of a mistake of the stenographer in transcribing the notes, this being merely the hearsay repetition by the witness of the stenographer's unsworn statement that the book contained her stenographic notes of the letter.  pp. 372, 373

Before a memorandum, not in the handwriting of the witness testifying in regard thereto, can be referred to by the witness or offered in evidence, it must be shown that the witness has before seen it and recognized it as true, and at the time of the trial is still satisfied of its truth.        p. 373

A witness should not be allowed to refresh his memory by the use of a document or writing made by another person, unless he knows it to be correct.        p. 374

Where the witness has no recollection of the facts recorded in a writing, made by another, and sought to be used by him in testifying, it must not only appear that the writing was contemporaneous with the event to which it refers, but that the witness at the time knew it to be correct.        p. 374

The dictation of a letter to a stenographer and its record by her in the form of stenographic notes do not constitute an entry made in the ordinary course of business by a clerk or bookkeeper, within the meaning of the rule allowing such entries to be offered in evidence.        p. 374

A prayer is not improper because, instead of concluding to recovery, it merely instructs the jury as to the legal effect of certain facts in evidence.        p. 375

A prayer to the effect that if the jury found that a certain broker was employed by defendant's decedent to purchase the tomatoes involved in the action, and that such broker purchased the said tomatoes from the plaintiff "on the pavement," then plaintiff was not liable for loss or damage subsequently arising, *held* improperly granted, in view of uncontradicted evidence that at least one shipment of the tomatoes was ordered directly from plaintiff by decedent, there being thus no evidence that all the tomatoes were purchased through the broker.  p. 376

That a creditor receives less than the amount of his claim, with knowledge that the debtor claims to be indebted only to the extent of such payment, does not necessarily establish an accord and satisfaction.        p. 377

Although there is a dispute between a debtor and creditor as to the amount which the former owes, the acceptance by the latter of a sum smaller than the amount claimed by him does not

operate as a satisfaction of the claim, unless he agrees to accept it in full settlement.                                    p. 377

An agreement to accept part of a claim as a satisfaction thereof will not be inferred from the mere fact that the claimant accepts such part with knowledge that the balance is disputed, but there must be in addition some evidence from which it can be inferred that such an agreement was made.      p. 377

In the absence of any statement that checks sent by a debtor to his creditor were sent in full and final settlement of the creditor's claim, an agreement so to accept them could not be inferred, as a legal presumption, from the fact that, when the debtor sent them, he indicated that he would not pay the balance of the claim, especially if, while complaining of the condition of the goods on account of which the claim was made, he did not expressly state that he would not pay for the whole quantity shipped.                              pp. 377, 378

That the creditor's invoices bore the printed statement: "Receipted bill will not be returned unless requested," had no particular significance in this connection.            '      p. 378.

*Decided January 11th, 1921.*

Appeal from the Baltimore City Court (AMBLER, J.).

The cause was argued before BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Edward Duffy* and *Watson E. Sherwood,* for the appellant.

*George M. Brady,* with whom were *Wescott & Weaver* and *Maloy & Brady* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the court.

This is an action in assumpsit brought in the Baltimore City Court by the appellee, the plaintiff below, for the recovery of the unpaid balance of the purchase price of tomatoes, which he claimed to have sold to Samuel M. Robinson,.

of whose estate the appellant, the defendant below, is executor and trustee; for expenses incurred in hauling the tomatoes to the cars in which they were shipped; and for the value of a large number of the baskets in which the tomatoes were contained, and which were to have been returned by Robinson to the appellee.

In addition to the common counts, the declaration contains a special count, in which it is alleged, in substance, that the plaintiff sold to Samuel M. Robinson tomatoes in the quantities and at the prices set forth in the bills of particulars filed with the *narr,* and that at the same time he was employed by Robinson to do the "carting of said tomatoes," at the prices set out in the bills of particulars, and that in consequence of such employment he did the carting mentioned, and that thereupon Robinson became indebted to him in the sum of $15,013.76, of which $5,892.48 had been paid, leaving an unpaid balance of $9,121.28; that the several sales and agreements under which the tomatoes were sold constituted a "season's transaction." Attached to the declaration were eleven "open accounts" setting out in detail the charges made by Rode against Robinson. The first ten set forth the price and "cartage" charges of as many different shipments of tomatoes, the first of which sales was on July 22nd, 1918, and the last of which was on August 21st of the same year. The eleventh set out the number and price of certain baskets in which the tomatoes had been shipped to Robinson, and which belonged to the plaintiff, and which it was claimed Robinson failed to return.

The trial resulted in a verdict for the plaintiff for $9,-121.29, upon which in due course a judgment was entered, and from that judgment this appeal was taken.

The record contains fourteen exceptions, thirteen of which relate to the court's rulings upon questions of evidence, and one to its rulings on the prayers.

The nature of the questions presented by the appeal call for no extended review of the evidence, and in dealing with

them a brief analysis of the actual controversy between the parties will be sufficient. The theory of the plaintiff's case, as stated by his witnesses, is that the tomatoes were all sold to Robinson "on the pavement" or "in the store" in Philadelphia, and that, as they then were of the quality and in the condition represented, he was entitled to receive from Robinson the full amount of the purchase price therefor, without deduction for any damage resulting to them from any cause whatever during their transportation from the pavement or store, 'where they were when sold, to Robinson's place of business in Baltimore.

The appellant's defense to the action cannot be so briefly stated nor so readily ascertained. Samuel M. Robinson, who actually conducted in his own behalf the negotiations incident to the purchase of the tomatoes, died before the present suit was instituted, and consequently the appellant's theory of the case must be gathered from the telegraphic and written correspondence between Robinson and Rode, from the testimony of the appellee's witnesses, and such inferences as may properly be drawn therefrom. By reference to these sources of information it appears to be this: that as Robinson from time to time, as the shipments were made, denied the accuracy of the appellee's statements of his indebtedness, and contended, in effect or by implication, that Rode, as the seller, was not only obliged to see that the tomatoes were as represented when sold, but was also bound to see that they were safely carried to the cars and loaded for shipment to Robinson, and that as the tomatoes when received were in bad condition as a result of Rode's default in either the one duty or the other, he, Robinson, was entitled to deduct from the amounts of Rode's bills the price of all such tomatoes as were unfit for use when received by him at Baltimore, and also to deduct the "cartage charges," that there was, as a result of their respective contentions, an actual dispute between them as to the real meaning and effect of the contract or contracts of sale at the time each of the several shipments

of tomatoes was received, and also as to the amount due by Robinson to Rode on account of them; and that since Robinson sent out checks in payment of the several shipments for the amount named in the statement sent him by Rode, less the deductions which Robinson claimed should be made, and at the same time sent Rode certain memoranda, written on the invoices or statements, as well as on separate papers, and that as Rode, with knowledge of the dispute, and of the purpose for which the checks were sent, accepted and used them, he thereby entered into an "accord" with Robinson, that the checks should be in full settlement of any claim which Rode might have against Robinson for or on account of such shipments, and that upon the payment of such checks all such claims were satisfied.

Practically all the negotiations were carried on by three persons, Samuel M. Robinson of Baltimore, a manufacturer of canned goods, William L. Fidler, a produce broker, operating in Philadelphia, but who had no fixed place of business and Charles L. Fidler, his son, who was employed by Rode and who represented him in the transactions involved in this case.

In 1918 Robinson, needing a supply of tomatoes for use in his factory during that season, employed William L. Fidler to purchase for him a part of that supply. Fidler thereupon on different occasions purchased tomatoes from J. William Rode, a commission merchant in Philadelphia, who was represented on those occasions by Fidler junior. He purchased these tomatoes "on the pavement" or "in the store" in Philadelphia, and he, Fidler Sr., Robinson's broker, superintended the hauling of the tomatoes to the cars for shipment, and also saw to the loading of them, but the carters who did the hauling were actually paid by Rode.

The tomatoes so shipped arrived in Baltimore in bad condition, due, it was claimed, to the manner in which they had been loaded. As each shipment was made Rode sent a statement of the amount due on it for the price of the tomatoes,

and for the cartage, the expense of hauling them to the cars, and as these statements were received by him, Robinson deducted from the amounts charged thereon the charges made for such tomatoes as were damaged and the charge for cartage, and sent Rode his check for the balance, occasionally at a lower rate than that charged in the statement, and at the same time he sent with the check Rode's statement with the changes and deductions written thereon, and also attached a written memorandum setting out in greater detail these changes and deductions, and on August 1st he wrote a letter to Rode again, directing his attention to the deductions from Rode's charges for shipments made prior to that time and to the reasons therefor,

In addition to the tomatoes thus purchased through Fidler Sr., as a broker, Robinson bought one shipment directly from Rode, and he also made changes and deductions in the statement sent him for the amount due on that shipment, and sent his check on account of the amount appearing to be due after these changes and deductions had been made. These checks and memoranda were in due course received by Rode without comment or complaint. He cashed the checks but, except for such inferences as may be drawn from that fact, he did not inform Robinson whether he was satisfied with the deductions and changes so made, or make any protest against them until he had completed his shipments.

This is explained by Fidler Jr. as due to the fact that they did not take Robinson "seriously." He said that no attention was paid to the deductions and memoranda thus made by Robinson, that he "had never taken seriously anything that Robinson would have done"; if he had split the bills in half witness would not have taken them seriously; that they paid no attention to Robinson's telegram to Rode of August 3rd reading "four cars just arrived. Not ordered. Cannot use all. Advise." While the record does not disclose any reason for this facetious view of Robinson and his conduct, as a matter of fact nothing was said to Robinson

about the deductions until after the last shipment from Rode to Robinson had been made, and even then specific reference was only made to a single shipment.

At the time the tomatoes referred to were sold the plaintiff claimed that it was understood that the baskets containing them belonged to the seller, and should be returned to him by the buyer, and as Robinson failed to return a part of them, the appellee also sought to recover in this action the value of the baskets so retained.

The plaintiff was permitted to prove, over the defendant's objection, that Fidler Sr. had been employed as a broker for Robinson in 1917 and also to prove the character and extent of his agency under that employment. Manifestly such testimony was inadmissible unless there was some connection between the employment in 1917 and the employment in 1918, which made it relevant, but while there was no evidence of any such fact at the time the testimony was given, Fidler Sr. later testified that Robinson had employed him in 1918 to buy tomatoes for him the "same as he always had," and consequently, since the manner in which he had formerly bought tomatoes for Robinson was adopted as the measure of his authority in 1918, the nature and extent of that authority was a material fact, and there was therefore no reversible error in the rulings which are the subject of the first, second and third exceptions.

Frank E. McGowan, a commission merchant operating in Philadelphia, was asked: "Is there any custom among the commission men, and buyers buying from them, as to the place of sale general, and fixed?" He was permitted, over objection, to answer the question and said: "Do you mean how we sell the stuff?" and added, "We sell the stuff right in our store." The court then said: "No. Is there a fixed invariable custom among all the commission merchants in Philadelphia?" Having said there was, he was then asked: "What is the custom?" This question was also permitted over objection and the witness testified that they sold every-

thing deliverable in their stores. He further said that that
was the custom in the "downtown market," but he could not
"say so much for the other one"; that there were two markets
in Philadelphia, the downtown market and the uptown mar-
ket, but that he was not acquainted with the uptown market.
There was no testimony as to the length of time the custom
had prevailed. The defendant then moved to strike out the
testimony, but the motion was overruled. These rulings are
the subject of the fourth, fifth and sixth exceptions. In
our opinion there was error in these rulings. The custom
was at most a local usage applicable to persons in a particu-
lar business and only shown to have been recognized in one
of the two Philadelphia markets referred to in the testimony.
Such testimony was clearly irrelevant as to the purchases
made through Fidler Sr., because he testified positively to
the terms and conditions of the contracts of sale under
which he bought the tomatoes purchased by him for Robin-
son from Rode, and as such terms and conditions were plain
and unambiguous, no evidence of custom or usage was admis-
sible either to corroborate the witness or to control or vary
the contract (*Rich* v. *Boyce,* 39 Md. 326; *Susquehanna Fer-
tilizer Co.* v. *White,* 66 Md. 444), "for while usage may be
admissible to make plain what is doubtful it is never admis-
sible to contradict what is plain" (12 *Cyc.* 1092), and as
there was no proof that the usage or custom was known to or
adopted by Robinson he could not have been bound by it.
*Oelrichs* v. *Ford,* 21 Md. 520; *Appleman* v. *Fisher,* 34 Md.
540; 27 *R. C. L.* p. 163; 3 *Jones Ev.,* par. 464. And it
could not have affected the contract of sale made by him
directly with Rode.

John W. Wescott, a lawyer practicing his profession in
Philadelphia, and who was one of the counsel for the plain-
tiff, after stating that he knew "something" about the laws
of Pennsylvania was asked: "If a contract was entered into
in the State of Pennsylvania whereby, upon an order of a
broker acting on behalf of a prospective buyer of goods, the

goods were ordered from the seller and delivered to the broker on behalf of the buyer, who subsequently sent the seller a check for less than the agreed price which bore the words 'in full settlement,' or 'in full settlement to date,' in the absence of any other consideration, agreement or release, whether the use of such check by the seller operated as a discharge of the purchaser's obligation to pay the full amount of the purchase price," and the witness replied, it did not so operate. The court's ruling in allowing this question is the subject of the seventh exception. The question was improper for various and obvious reasons, but as it does not appear that the appellant was injured by it, since the learned judge while admitting the question told the jury that they need not be bothered about the answer, and subsequently, in granting the defendant's third prayer, effectively neutralized any effect which the opinion of the learned *amicus curiae* may have had, there was no reversible error in this ruling.

The eighth exception relates to the ruling of the lower Court in refusing to allow certain freight receipts to be offered in evidence. These bills did not relate to any shipment or claim mentioned in the declaration, and were collateral to any issue or proper inquiry in the case, and there was no error in this ruling.

The ninth and tenth exceptions relate to the court's rulings in striking out testimony of Herbert M. Robinson that he had heard Samuel M. Robinson ask Fidler Jr. if Fidler Sr. "had gone crazy," and had heard him answer, "He must, because he has ruined both Rode and myself" and that he, the witness, had shown Fidler Jr. "the goods that had been packed on Monday," and that Fidler wanted all these goods "put aside and they were put aside, the whole of Monday's pack." So far as any probative force possessed by this evidence in relation to any fact in issue is concerned, it may as well have been out of the case as in it, and we see no reversible error in the court's rulings in regard to it.

The defendant offered in evidence a letter dated September 16, 1918, from Wescott & Weaver, counsel for appellee, which contained the following statement: "Mr. William Rode of Philadelphia has handed us a statement showing that you are indebted to him in the sum of $1,038.91." This happened to be the exact amount which Rode claimed Robinson owed him on a shipment of tomatoes made in consequence of a direct order from Robinson, and was the same shipment referred to by Rode in his letter of August 24th, in which he complained for the first time of any deductions made by Robinson from the statement of his indebtedness sent by Rode. An admission therefore on September 16th, when all the shipments had been made and the checks, sent in payment of them in accordance with Robinson's contention as to the amount he owed, had been accepted and used, that Robinson's indebtedness to Rode was for that sum only, had a very important and material bearing upon the plaintiff's claim that Robinson was indebted to him for balances on other shipments.

After this letter was offered in evidence Ethan P. Wescott, a son of John W. Wescott and a member of the firm of Wescott & Weaver was called as a witness for the plaintiff and, after stating that he dictated and signed the letter in question, produced a stenographer's note book purporting to contain the stenographic notes of the letter made by the stenographer to whom he dictated it; he further testified that the stenographer was then, he was told, living in Atlantic City. The witness was then permitted over defendant's objection to testify that the stenographer's notes showed that the figures contained in the letter were put there through the stenographer's mistake and should have been $10,038.91 instead of $1,038.91. The rulings in reference to these objections are the subject of the twelfth and thirteenth exceptions. In our opinion this testimony was improper and should not have been admitted. The witness had no independent recollection of the facts and was unable to recall or refer to any

statement or claim which contained either a single item or a number of items, the aggregate amount of which coincided with the figures contained in the book he produced; he did not know at the time the notes were made that they were correct, because he did not look at them then, and never read them at any time, because he was not able to read shorthand; nor did he say that he remembered dictating to the stenographer the figures contained in the book offered in evidence. The notes were not used therefore, to brighten the fading recollection of the witness of some matter which he once knew but had forgotten, nor were they offered as a memorandum of some fact or transaction which the witness knew to be correct when made and which he still believed to be correct, because he never had any such knowledge; nor was it offered as the entry of a clerk or bookkeeper made in the ordinary course of business, because it was not such an entry; nor were they even used to corroborate the witness, because he himself did not testify that he knew he had dictated the present figures contained in the notes. This testimony was no more than the witness' hearsay repetition of an unsworn statement of the stenographer that the book contained her stenographic notes of the letter. The memorandum was used, therefore, to show that the person who had made it made an error in the transcription of its contents to the letter sent to Robinson. There was no proof of any kind that the memorandum was accurate, or even that it was the original memorandum made by the stenographer, except the statement of the witness that some time after the letter was written he had the stenographer "go back over her old note books and find in her notes the letter which witness had dictated," and that she "found the book," which the witness produced.

The general rule relating to the use of memoranda in evidence, where they are not in the handwriting of the witness testifying in connection with them, is that before they can be referred to by the witness or offered in evidence, it must be shown that the witness "has before seen the memorandum

and recognized it as true, and at the time of the trial is still satisfied of its truth," and he should "not be allowed to use any document or writing to refresh his memory which was made by another person unless he knows it to be correct." 5 *Jones, Evidence,* par. 877. And where the witness has no recollection of the facts recorded, it must not only appear that the writing was contemporaneous with the event to which it refers, but that the witness "at the time" knew it to be correct. *Ibid,* par. 881; *Spiker v. Nydegger,* 30 Md. 315. This rule is very clearly stated in *Green v. Caulk,* 16 Md. 556, in which it is said "not to be necessary that the memorandum should have been made by the witness, but, if it was made at the time, or about the time, of the occurrence of the facts recorded in it, and the witness from having then seen and recognized it, as containing the truth, of which he is still convinced, at the time of the trial, he may be ex-amined in regard to it," and citing 1 *Greenleaf on Evidence,* Sec. 436, quotes the statement that where the witness "neither recollects the fact nor remembers to have recognized the written statements as true, and the writing was not made by him, his testimony, so far as it is founded upon the written paper, is but hearsay." Applying the principles thus stated to the facts before us, it is apparent that the stenographer's note book was not admissible as a memorandum of what Wescott actually did dictate to her on the occasion referred to, nor was it admissible under the rule whereby the entries of clerks or bookkeepers made in the ordinary course of busi-ness are when properly proven admitted in evidence. It re-quires no citation of authority to show that the dictation of a letter to a stenographer and its record by her in the form of stenographic notes is not an "entry made in the ordinary course of business" by a clerk or bookkeeper within the mean-ing of the rule allowing such entries to be offered in evidence. The admission in evidence of the entries of clerks and book-keepers made in the ordinary course of business is allowed under one of the exceptions to the rule against hearsay, on

the ground of necessity, and the reason for the rule in such cases is this: that the operation of mercantile, industrial and other business enterprises involves an infinite number of small intricate interrelated items and details, continually arising from the varied activities of many different persons in connection with the business. No one person could know or remember all these details and as the persons who do know of them are constantly coming and going and changing and often cannot be traced, it follows that often the only evidence of the transactions is in the entries they made of them as part of their duty in the account and record books of the business. But manifestly stenographic notes of such matters as are dictated to the writer of them and which can ordinarily be read only by the person making them, do not fall within the reason or the letter of the exception. 2 *Wigmore, Evidence,* Par. 1420. If the testimony had been otherwise valid, the fact that the stenographer was living at the time of the trial would not have affected its admissibility, where it also appeared that she was not within reach of the court's process. *Heiskell* v. *Rollins,* 82 Md. 15.

This brings us to the consideration of the court's rulings on the prayers. By the plaintiff's first prayer the jury were told that if they found that Samuel M. Robinson had employed William L. Fidler as a broker to purchase the tomatoes involved in this dispute and that he purchased the said tomatoes from the plaintiff "on the pavement" and that they were delivered to and accepted by Fidler on the pavement in Philadelphia, that there and then the plaintiff's responsibility for such tomatoes ended, and he could not be held responsible for any loss or damage subsequently arising from "faulty packing or bad handling in transit or delay in delivery in Baltimore." This prayer did not conclude to recovery but merely instructed the jury as to the legal effect of certain facts in evidence. The propriety of such an instruction has long been recognized in this State (*Johnson* v. *Harvey,* 30 Md. 259), and the proposition submitted was a cor-

rect statement of the law, but the defendant contended that
there was no evidence in the case to support the hypothesis
that Fidler was employed to purchase all of the tomatoes in
dispute; or that Fidler had purchased all of such tomatoes
on the pavement in Philadelphia; or that all of such toma-
toes were delivered to or accepted by Fidler, and specially
excepted to the prayer on that ground. It was proved by
the plaintiff and not contradicted that at least one shipment
of the tomatoes in dispute was ordered directly from Rode
by Robinson himself, and sent under the authority of that
order, so that it is a fact that there was no evidence that *all*
the tomatoes were ordered by Fidler, and for that reason the
prayer should have been refused. The plaintiff's second
prayer related to the measure of damages and in our opinion
embodies a correct statement of the law in that respect.

The defendant's fourth, fifth, sixth, seventh and eighth
prayers rest upon the proposition that if Robinson, as he re-
ceived statements or invoices from Rode covering the ship-
ments of tomatoes to him, indicated in writing thereon cer-
tain deductions from the charges set forth therein, and sent
the invoice or statement thus amended to Rode together with
other memoranda, letters, and telegrams, indicating that he
disputed the charges made by Rode for the tomatoes, and
sent Rode his checks covering the several shipments, for the
amounts he, Robinson, admitted to be due thereon, and that
Rode knowing of the dispute and having before him the in-
voices, memoranda, telegrams and correspondence, contain-
ing the details of the deductions and the reasons therefor,
accepted and used the checks, that it is to be presumed as
a matter of law that he accepted the checks in satisfaction
of any claim he had on account of the shipments on account
of which the checks were to be applied. In considering this
question the presence of the words "in full settlement" or
"in full settlement to date" appearing on several of the
checks will be disregarded because in these prayers the de-
fendant insists that the facts stated present a complete ac-
cord and satisfaction irrespective of the use of such words.

and the appellant had the benefit of such inferences as could have been drawn from their use in his granted prayers.

Coming then to the proposition thus submitted, the general rule has been thus stated: "To constitute an accord and satisfaction in law dependent upon the offer of the payment of money, it is necessary that the offer of money be made in full satisfaction of the demand or claim of the creditor, and be accompanied by such acts or declarations as amount to a condition that if the money is accepted, it is to be in full satisfaction and of such a character that the creditor is bound to understand the offer." 1 *R. C. L.* p. 195. And "the mere fact that the creditor receives less than the amount of his claim with knowledge that the debtor claims to be indebted to him only to the extent of the payment made does not necessarily establish an accord and satisfaction." 1 *Cyc.* 323. But while it is settled that where there is a dispute between a debtor and a creditor as to the amount the former owes, that an acceptance of a smaller sum by the creditor in full settlement of the claim operates as a satisfaction of it (*Scheffenacker* v. *Hoopes,* 113 Md. 111), it is equally clear that such payment will not have that effect unless the creditor agrees to accept it in full settlement of the claim, and such an agreement will not be inferred from the mere fact that the creditor accepts part of the claim with knowledge that the balance is disputed, but there must be in addition some evidence from which it can be inferred that such an agreement was made. Now in this case if we exclude the words "in full settlement" and "settlement in full to date," as we must in passing on these prayers, there remains no evidence which compels the inference that the appellant received the checks in question in full satisfaction of his claims. For in all the memoranda, invoices, telegrams and correspondence, Robinson nowhere stated that the checks were sent in full and final settlement of Rode's claims, and we do not think, in the absence of any statement of that kind, that such an inference must be drawn, as a legal pro-

sumption, from the fact that when he sent the checks for part of Rode's claim he indicated that he would not pay the balance, and especially so since, while he complained of the condition the goods were in when received, he did not expressly tell Rode he would not pay for the whole quantity shipped. Nor do we attach any particular significance to the fact that Rode's invoices bore the printed statement: "Receipted bill will not be returned unless requested." That was Rode's statement and not Robinson's, and at most could only explain why no receipts for the various payments were returned.

For the reasons given the prayers in question were properly refused.

The exceptions to the court's action in refusing the defendant's ninth and tenth prayers were not pressed in this Court, and it is unnecessary to discuss them further than to say that we have discovered no error in the rulings involved in them.

Because of the errors indicated above it will be necessary to reverse the judgment appealed from.

> *Judgment reversed, with costs and cause remanded for a new trial.*