## DONNELLY ADVERTISING CORPORATION OF MARYLAND v. FLACCOMIO

[No. 155, September Term, 1957.]

114

116

*Decided March 21, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

David Ross and Frank B. Ober, with whom were Ober, Williams, Grimes & Stinson on the brief, for the appellant.

Philander B. Briscoe for the appellee.

HORNEY, J., delivered the opinion of the Court.

This is an appeal by the Donnelly Advertising Corporation of Maryland, (the tenant), from a judgment for $350 obtained by Annie Flaccomio, (the landlord), in the Superior Court of Baltimore City (Mason, J., sitting without a jury). The judgment represents two months' rent which the trial court held was due under an "implied" lease which arose as a result of the tenant holding over after the expiration of a written lease which expired on March 20, 1956.

On November 16, 1955, the tenant acquired all of the property of The Morton Company, Inc., (the previous tenant), including the lease from the landlord to the previous tenant. The term of the original lease, which began on August 1, 1947, and ended on March 20, 1953, had been extended by written agreements for three successive terms of one year each, the last extension ending, as stated, on March 20, 1956. Each of the written agreements provided that the extended term would be on "the same terms and conditions of the original lease". The tenant was obliged to pay rent of $175 per month, plus ground rent of $60 per annum, water rent, and various taxes.

The property leased is a row house at 405 North Exeter

.Street in Baltimore City. It was particularly desirable as advertising space since it had acquired a side exposure towards ·Orleans Street after the condemnation by the City of the two .adjacent houses to the south in connection with the construction of the Orleans Street Viaduct. The condemnation left alongside of the landlord's house a small lot of land owned by the City. When the original lease was executed the house was vacant and in an uninhabitable condition. At first the previous tenant used the building for the support of a signboard on the south wall facing Orleans Street and as space for another painted sign. It was also used for housing the electrical equipment for the sign and part of the equipment ·for the thermometer on the sign. A hole was cut through the wall of the house for that purpose. Later the previous tenant sank steel girders into the adjacent vacant lot of the City. Although some steel braces between the sign and the house remained until the tenant vacated, the billboard was thereafter supported in the main by these girders. While the previous tenant had the right under the lease to use the property for ·any purpose whatsoever, there is no evidence that any part ·of it was used for any purpose other than those mentioned above, except the first floor which was sublet to a neighboring manufacturer for the storage of equipment.

Since a decision of this case depends primarily on the interpretation of a series of letters between the parties, it is necessary to discuss and analyze such letters with particularity. On December 8, 1955, the tenant wrote to Murray ·McNabb, Esq., who was then the attorney for the landlord, stating that it had acquired the interest of the previous tenant in the property. Realizing that the then current extension expired on March 20, 1956, it said: "We will at that time arrange for an assignment of lease between the proper parties." On February 29, 1956, the tenant wrote to the landlord confirming a verbal offer made by it on February 23, 1956, to pay a rental reduced from $2100 a year to $1000 a year, but for a five-year term instead of a one-year term. On March 12, 1956, the attorney for the landlord replied to this offer: "* * * [the landlord] is not willing to rent her ·property for less than the amount it has been bringing for the

past several years, as she said she could have put stores here but for this lease."

By March 20, 1956, the expiration date of the lease, nothing further had been done. Until this date, the tenant had offered to lease at a lower rental, but the landlord had flatly refused to accept the offer. On March 23, 1956, the third day after it had begun to hold over, the tenant wrote the following letter to the landlord:

"Due to the fact that the present lease has expired, and as you are aware, we are attempting to renegotiate a new lease with you.

"We will continue on the same rental basis from month to month until such time as we can come to some agreement as to the future.

"We reserve the right to vacate the property upon thirty (30) days' written notice at any time should we fail to be able to make satisfactory arrangements.

"Check for one month is enclosed."

On March 30, 1956, the tenant received the following letter from the landlord's attorney:

"Your lease has expired and I have authorized * * * [the landlord] to deposit the one check which pays for the current month, but * * * [the landlord] desires me to inform you that she is not willing for you to continue on a month to month basis, but she will rent year to year.

"Please arrange to sign a lease for a year or remove your property from the premises and restore the premises to its former condition prior to the lease."

Nothing further was heard from the tenant until April 16, 1956, when the landlord received a check for the rent from April 20, 1956, to May 20, 1956. In the letter accompanying the check the tenant stated that it would not continue to lease the property beyond May 20, 1956. Therein the tenant also stated that there had not been a renewal of the "previous agreement". On the same day, April 16, 1956, the landlord's attorney wrote to the tenant enclosing the bill for the ground

rent which the tenant was obliged to pay under the original lease. The attorney added:

"I have heretofore notified you that * * * [the landlord] is not willing to rent this property from month to month but must be from year to year so that if you are not out of there immediately and have not moved your equipment we shall consider that you are taking it for another year under the same terms or I shall have to issue ejectment proceedings, whichever we find most advantageous to us.

"You must understand that * * * [the landlord] does not wish to lose any of her rights in the property by letting you stay there without a lease and it is my duty to protect her in this respect."

On April 20, 1956, the tenant replied to the attorney, stating that it would send $30 in payment of six months' ground rent to the owner of the reversion. On April 25, 1956, the attorney wrote to the tenant that:

"Inasmuch as you have gone over two months since the termination of the lease, I believe that under the law you have automatically renewed the lease for another term of year to year."

The tenant countered on April 27, 1956, by stating that it would vacate on May 20, 1956, but once again, on May 2, 1956, the attorney for the landlord insisted that the lease had been "automatically renewed * * * for a period of a year on the same terms."

This suit was brought to recover the rent claimed to be due for the months beginning May 21, 1956, and June 21, 1956, respectively, on the theory that the tenant was holding over under an implied lease for one year beginning March 21, 1956, and ending March 20, 1957, since it remained on the premises after March 20, 1956, until May 15, 1956. The landlord further contended in the alternative that the tenant continued to occupy the premises after May 15, 1956, but the trial court rejected this contention as not being supported

by the evidence, finding as a fact that the tenant had vacated on May 15, 1956. However, the trial court accepted the landlord's implied lease theory and awarded her a judgment for two months' rent and costs.

Estates from year to year are a class of estates at will, from which they originated. Such estates may endure for one or more years, and are now terminable in Baltimore City at the end of thirty days' notice expiring at that period of the year at which the tenancy commenced, or that period fixed by the parties for the tenancy to end. The tenancy is created by express agreement or by implication. A peculiar form of this tenancy occurs where a tenant for years holds over after the expiration of the term, and the landlord accepts rent accruing after such expiration. The *provisions and covenants* of the original lease, so far as they are consistent with a yearly holding, *continue,* and the parties are mutually bound by them. *Venable, Real Property,* p. 60. And see *Hall v. Myers,* 43 Md. 446 (1876), in which it was held that where property is rented for a term of years, at an annual rent, and the tenant remains in possession after the expiration of the original term of renting, paying rent therefor at the rate agreed upon when he took possession of the property, he is to be regarded as a tenant from year to year. See also *Hobbs v. Batory,* 86 Md. 68, 70, 37 A. 713 (1897), and *Gostin v. Needle,* 185 Md. 634, 637, 45 A. 2d 772 (1946).

However, the general rule is that a tenant who has remained after the expiration of the term is not a tenant holding over, and thus liable for a full year's rent, if such tenant has remained *with the express or tacit consent* of the landlord while the parties negotiate for a new lease. But the mere existence of negotiations is not sufficient to relieve the tenant from liability if the landlord has not actually consented to the holding over. *Fetting, etc., Co. v. Waltz,* 160 Md. 50, 152 A. 434 (1930); *Clinton Wire Cloth Co. v. Gardner,* 99 Ill. 151 (1881); *Valentine v. Healey,* 158 N. Y. 369, 52 N. E. 1097 (1899); *Smith v. Snyder,* 168 Pa. 541, 32 A. 64 (1895); *Abeel v. McDonnell,* 39 Tex. Civ. App. 453, 87 S. W. 1066 (1905); *Tonkel v. Riteman,* 163 Miss. 216, 141 So. 344 (1932); *Foster v. National Tea,* 74 N. D. 37, 19 N. W. 2d

760 (1945). Of course, as stated, if the parties are actually negotiating for a new lease at the time the prior lease expired, and the tenant remains in possession pending such negotiations, with either the express or tacit consent of the landlord, the landlord would be estopped from thereafter treating the tenant as holding over for another term on the same conditions as before. *Leggett v. Louisiana Purchase Exposition Co.*, 157 Mo. App. 108, 137 S. W. 893 (1911). See also *Wilcox v. Raddin*, 7 Ill. App. 594 (1880), *Drake v. Wilhelm*, 109 N. C. 97, 13 S. E. 891 (1891), *Montgomery v. Willis*, 45 Neb. 434, 63 N. W. 794 (1895), *Landsberg v. Tivoli Brewing Co.*, 132 Mich. 651, 94 N. W. 197 (1903), *Weber v. Powers*, 213 Ill. 370, 72 N. E. 1070 (1904), *Phipps Estates v. Tong Phong*, 214 N. Y. 308, 108 N. E. 410 (1915), and *Bumiller v. Walker*, 95 Ohio St. 344, 116 N. E. 797 (1917). But in order for negotiations to exist there must be two parties to consider the matter. If one of them is *not negotiating* when the term ends, then surely there has been a cessation of negotiations. See *Leggett v. Louisiana Purchase Exposition Co., supra.*

Stated otherwise, the landlord is entitled to treat the tenant *as a tenant holding over* for another term of one year unless the tenant has definitely established one of two circumstances: either (i) that the landlord *consented* to the tenant remaining in the premises on a month-to-month basis, or some other specified time, for a temporary period, or (ii) that the parties were *actually engaged in negotiations* as to a renewal of the lease when the previous term ended. We think it is clear that the tenant failed to prove either of the determining factors.

We are unable to hold, under any reasonable construction of the acts of the parties, including particularly the correspondence between them, that the landlord gave the tenant either express or implied consent to remain on the premises after the date of the expiration of the lease. Only three letters had passed between the parties prior to March 20, 1956: (i) the letter of December 8, 1955, in which the *tenant merely informed the landlord* of its purchase of the interest of the previous tenant; (ii) the letter of February 29, 1956, in which

the *tenant confirmed an offer* to pay the landlord a lower rental for a new five-year lease; and (iii) the letter of March 12, 1956, in which the *landlord flatly rejected* the offer of the tenant by informing it that she did not wish to rent her property for less than she had been receiving. There was no suggestion or intimation in that letter that she was willing to either bargain or negotiate further. Nor is there anything in that letter that should have led the tenant to believe that the landlord was consenting to its remaining in the premises until a new lease could be negotiated or until the bargaining therefor had terminated either one way or another.

The tenant insists that the existence of "negotiations" led it to believe that it could hold over for that purpose. The weakness of this theory, which makes it untenable, is that it would permit a tenant, who blithely writes a letter to the landlord offering a lower rental for a renewal lease, to remain on the premises after the expiration date with impunity. Under such circumstances, even if the landlord rejected the offer, the tenant could successfully defend by asserting that it was not a tenant holding over, but was simply engaging in negotiations. In the case at bar, even if actual negotiations had been in progress before the expiration of the lease, such negotiations were obviously unsuccessful and were abandoned. Certainly the existence of abandoned negotiations would not justify a tenant remaining on the premises, and it would be unreasonable to permit the tenant to dictate to the landlord the terms under which it would continue to remain after it had held over for several days, and then claim that such tactics constituted negotiations still in progress. That is precisely what the tenant did in its letter of March 23, 1956.

The case of *Tonkel v. Riteman, supra,* cited by the tenant, is cogent authority for the position taken by the landlord. In that case, during the month preceding the expiration of the lease, the tenant informed the agent of the landlord that he wanted a reduction in the rent or else he would hold the premises only from month to month. The agent made no agreement one way or the other, promising only to discuss the matter with the landlord. No further negotiations were held, and the tenant remained in possession after the expira-

tion of the term. The language of the Court is particularly appropriate to the instant case:

"It is immaterial that the tenant may have notified the landlord that he will not renew the lease, or that he will remain only for a lesser period than that of the original lease or that he will pay a lesser amount in rent, * * * unless the landlord thereupon consents that the holding over shall be upon new or different terms, or unless the equivalent of consent shall arise out of the fact that the tenant has remained in possession pending negotiations for a new lease. * * * And in order that the negotiations shall be fairly and justly the equivalent of, or a substitute for, consent, the negotiations * * * must be actual and substantial * * *, not mere suggestions or requests or demands therefor or tentative approaches thereto, but upon which there has been no actual or substantial entry and upon which there has been no commitment that the landlord will in fact enter. * * * Such negotiations must amount to more than a request for the consideration of new terms on the side of the tenant and the promise by the agent without any further commitment to refer the question to the landlord on the other, * * *. The conversation between the tenant and the agent in respect to a new lease had not brought the transaction into such a state of progress as that it may be considered as having attained to the dignity of negotiations."

In *Clinton Wire Cloth Co. v. Gardner, supra,* a landlord recovered rent despite the fact that there had been some negotiations between the parties in regard to a new lease. The premises, which rented at $200 per month, were to be vacated by January 1. On December 24, the landlord offered the tenant the premises for another year at $100 per month, but the offer was not accepted. On December 31, the tenant began moving out, but suspended this operation in the afternoon, allegedly on the basis of a conversation with the landlord earlier in the day in which the parties had talked about even

lower terms, but no definite arrangement had been made. After the tenant had suspended the moving operation, he wrote the landlord asking if he could remain for a while in January. A few days later the tenant moved out, but the landlord elected to hold him for a year's rent. It was held that the landlord could treat the tenant as holding over for a year. The court concluded that the main inquiry in cases of this sort should be the determination of the intention of the landlord, and that the intention of the tenant is almost always irrelevant; for if it were material, a tenant could always maintain that his moving out after a few days was evidence of an intention not to stay for a year.

Likewise, in the case of *Fetting, etc., Co. v. Waltz, supra,* many negotiations were conducted in the months prior to the expiration of the lease on November 4, 1927, but such negotiations had failed by the first week of October. At the expiration of the term, the tenant remained in possession until November 26. On December 1, the tenant sent a check to the landlords for the previous month's rent, but the landlords insisted that the check was merely payment of the first monthly installment on account of the yearly sum payable under the implied lease which arose as a result of the holding over. We held that the landlords were entitled to recover a full year's rent. The negotiations having failed, the tenant could not contend that the landlords had *consented* that the tenant should remain in possession.

The cases are well summarized in 40 L. R. A. (N. S.) 498 (1912), where it is said that, although there may be negotiations, the landlord will not necessarily consent to the continued occupancy of the premises by the tenant. Therein it is further said:

> "In some instances the question is made to depend upon whether or not the holding over is with the landlord's consent, it being quite generally held that a holding over pending negotiations for a new lease with the landlord's consent does not constitute a renewal, while, if such consent has not been extended, either expressly or impliedly, a renewal is effected at the option of the landlord."

See also *Mastin v. Metzinger,* 99 Mo. App. 613, 74 S. W. 431 (1903). This case does not involve the same issue, but some of its language is pertinent. In Missouri, a tenant for a definite term is not entitled to a notice to quit unless he holds over with the express or implied consent of the landlord. The Court, in holding that when the landlord, after the expiration of the term, offered to lease again at a higher rate, he did not consent to a holding over, said:

> "It is true that the agent did not bodily eject * * *. [the tenant] from the premises, nor did he, immediately on the expiration of the lease, institute an action against him; but there was at no time the slightest indication that he consented to a continuance of the tenancy. It would be a strange condition of affairs if a landlord, in order to avoid implied consent to a continued tenancy under an expired lease, would be compelled to refuse to listen to a proposition of further lease, and set about immediately to eject the tenant."

Finally, we cannot hold that the trial court was clearly wrong in finding that the landlord had not committed herself to a month-to-month lease by reason of the letter of March 29, 1956, and the acceptance of a month's rent. We think there is no persuasive evidence that a *new* lease from month to month was substituted for the implied lease which arose as a result of the tenant holding over after the expiration of the *old* lease which expired on March 20, 1956. In all of the correspondence there is not the slightest indication that the landlord would consent to anything but a renewal of the old written lease from year to year or the execution of a new written lease embodying precisely the same terms and conditions as were in the old lease, and there is nothing in the record to refute this. The fact that the landlord wanted and kept insisting upon either a renewal of the old or the execution of a new written lease would not be fatal to her right to claim under the implied lease.

By operation of law, the tenant holding over became a trespasser, in the sense of being wrongfully in possession, or

a tenant from year to year at the election of the landlord, regardless of the wishes of the tenant. *Fetting, etc., Co. v. Waltz, supra; Gostin v. Needle, supra.* But in this State it is doubtful that a landlord is required to make a prompt election. The substance of the rule as expressed in *Tiffany, Real Property,* Sec. 175, p. 281 (3d ed. 1939), and other authorities, is to the effect that the landlord has the option to treat the tenant as *wrongfully* retaining possession or as *rightly* doing so. However, as we pointed out in the *Fetting* case, at p. 53: "This rule does not seem to have been expressly adopted in this jurisdiction." The fact that the tenant sent a check for one month's rent after the crucial date, proposing that it be accepted as a tenant from month-to-month does not alter the situation. The landlord never agreed to the proposal, so there was no substitution of a new lease for the implied lease which arose by operation of law, nor was there any alteration in the terms and conditions of the then existing implied lease. While it is true that the landlord, in accepting the check, did not at that time expressly elect to treat the tenant as a tenant holding over, it is clear that she definitely declined the tenant's proposal. For this reason we think the acceptance of the check, which was in the exact amount the landlord was entitled to receive for a month's rent under the old lease and from a *tenant holding over* under the implied lease for another year, did not bar her recovery of subsequent installments. Cf. *Mercantile Trust Co. v. Rode,* 137 Md. 362, 377, 112 A. 574, 580 (1921). The landlord demanded that the tenant "sign a lease for a year or remove * * * [its] property from the premises." Subsequently, she threatened ejectment proceedings if the tenant did not vacate immediately, but at the same time she stated that she reserved the right to hold the tenant from year to year or to eject it, whichever was "most advantageous to her". Still later, she informed the tenant that it had "automatically renewed the lease for another term of year to year." We think the landlord was not barred from subsequently making the election to hold the tenant under the implied lease after her previous demand and ultimatum had been declined and ignored, and the tenant continued to remain in the premises. Moreover,

we think it is a persuasive indication that the tenant must have had some doubt that it was not a tenant from month to month in that it paid one-half of the yearly ground rent when it became due.

Even if it is assumed that the acceptance by the landlord of a month's rent constituted tacit consent that the tenant could remain on the premises pending negotiations for a new written lease or a further extension of the old one, it is clear that such negotiations finally ceased on April 16, 1956, yet the tenant continued to remain on the premises until it saw fit to vacate.

Since we have decided that the tenant was *a tenant holding over* for the period of one year from March 21, 1956, to March 20, 1957, it is not necessary for us to decide in this case whether the tenant *completely* vacated the demised premises on May 15, 1956. In fact there is nothing more before us to decide. Apparently, the lower court did not pass directly upon the question of partial occupancy except to say that the tenant vacated on May 15, 1956.

The judgment of the lower court should be affirmed.

> *Judgment affirmed, the appellant*
> *to pay the costs.*

PRESCOTT, J., filed the following dissenting opinion, in which BRUNE, C. J., concurred.

I do not wish anyone to think that I disagree with the principles of law as they are so clearly enunciated by Judge Horney in his brilliant majority opinion. It is the treatment of the facts and their effect that prevent my concurrence. These facts, as related in the majority opinion, seem clearly to demonstrate that the parties had begun, and were conducting, negotiations having as their object a renewal of the lease—both sides, legitimately, attempting to obtain advantageous terms.[1] The appellant and its predecessors had leased

---

1. It is conceded by everyone that if negotiations are being carried on between a landlord and a tenant looking forward to a new lease between the parties, a tenant who remains in the property pending the outcome of the negotiations with the express or tacit

the property since 1947; the original lease had been extended *three* successive terms by written agreements; the tenant wrote the appellee's attorney as early as December 8, 1955, concerning the lease; and verbal and written negotiations before March 20, 1956, the expiration date of the lease, followed. *Three days* after the expiration date, the tenant wrote to the landlord the first letter quoted in the majority opinion. In it, the tenant specifically stated that the parties were negotiating for a new lease and offered to continue on the previous rental basis from month to month until such time as the negotiations were successful or broke down. A check for one month's rent was enclosed. Within a week, the landlord's attorney replied. The letter did not deny that negotiations were being conducted by the parties; nor did it make any claim that the tenant was holding over under a lease imposed by law for a year. On the contrary, it explicitly stated the check was *accepted* for the current month's rent and then went on to say, the landlord "desires me to inform you that she is not willing for you to *continue on a month to month basis,* but she will rent year to year." It is extremely difficult to comprehend how the tenant could "continue" on a month to month basis, if it never occupied that status, as the majority opinion holds. It was not until April 16, 1956, that any claim was made that the tenant was holding over under a new lease imposed by law. The tenant took the position, which seems proper especially when its letter so stated, that, upon the acceptance of its check for one month's rent, it became a tenant from month to month, and, in order to terminate this tenancy, it must give the landlord thirty days' notice, which it did. This made the expiration date May 20, 1956. The rent was paid in full until that time, and the tenant properly vacated the premises by that date. The above facts seem to make it clear the tenant was not only remaining in possession of the property with the tacit, but the express, consent of the landlord. She was anxious, as she had done before, to obtain a written lease for a year upon favorable terms. The

---

consent of the landlord does not afford the landlord an opportunity to treat the remaining as a lease for a year.

dilapidated condition of the property rendered it particularly desirable for her to lease to someone in such a business as that conducted by the appellant. For these reasons, I think the appellant should have prevailed.

Judge Brune has authorized me to say he concurs in this opinion.