# COMPANIA DE ASTRAL, S. A. *v.* BOSTON METALS COMPANY

[No. 150, October Term, 1953.]

*Decided July 27, 1954.*

*Motion for rehearing filed August 26, 1954, denied October 8, 1954.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*William A. Grimes,* with whom were *Herbert F. Murray* and *Ober, Grimes & Stinson* on the brief, for the appellant.

*David P. Gordon* and *Eugene M. Feinblatt,* with whom were *Gordon & Feinblatt* on the brief, for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

Boston Metals Company (hereinafter called "Boston"), a Maryland corporation, brought suit in the Baltimore City Court against Compania de Astral, S. A. (hereinafter called "Astral"), a Panamanian corporation, for breach of a contract for the sale of three vessels. Astral

appeared specially and moved to quash the summons and dismiss the suit. This motion was denied by Judge Warnken. After further pleadings the case went to trial before Judge Moser, without a jury, and resulted in a judgment for Boston for approximately $274,000.00. Astral's appeal brings up both the rulings on the motion and on the question of breach of contract. The latter question turns on the meaning of the contract, under which approval by the United States Government of the transfer of the vessels to the flag of Panama was required and Astral agreed to accept conditions to such approval relating to the "future use and disposition" of the vessels.

The principal questions at issue are these: (1) Was the contract between Boston and Astral made in Maryland, so that Astral is amenable to suit thereon in this State under Code (1951), Article 23, Section 88(d); (2) if so, is that statute constitutional; and (3) were the conditions imposed by the Maritime Administration on the transfer of the vessels within the scope of those to which Astral assented under the terms of the contract?

There is little, if any, dispute about the facts, which are summarized below.

Boston, the plaintiff-appellee, is a Maryland corporation having its principal office and its yard in Baltimore, Maryland, and is there engaged in the business of buying, selling and scrapping ships. Astral is a Panamanian corporation having its principal place of business in the City and Republic of Panama, and is engaged in the business of exporting bananas from Ecuador to the United States and other countries. It has a selling agent in New Orleans, Louisiana, the Estrella Fruit Selling Corporation (hereinafter sometimes called "Estrella"), but it has no office in the United States. Prior to the institution of this suit it was not "doing business' in Maryland within the meaning of Code (1951), Article 23, Section 88. Its contacts with Maryland and its activities and transactions in this State pertained to the contract involved in this case and to the three vessels

whose sale constituted the principal subject-matter thereof.

In 1946 Boston bought three frigates from the United States Navy. They had been built in Canada during World War II and were relatively long, narrow, fast and of shallow draft. However useful they may have been in wartime, they were not well adapted for peacetime commercial use and would require considerable changes to convert them for such use. After Boston purchased them it thought they might be sold for use as commercial vessels, doubtless at a better price than would have been realized by scrapping them. In 1947 Boston advertised the frigates for sale, but up to January, 1952, it received no firm offer for them. The ships remained in the harbor of Baltimore from 1946 until they were finally scrapped there in 1953.

At some time prior to January 9, 1952, Astral became interested in the possibility of acquiring vessels of the frigate class and converting them for use as banana boats. On that date, Mr. Folke Anderson, of New York, who is described as "foreign representative" for Astral, submitted an offer on behalf of Astral of $75,000 apiece for Boston's three frigates. This offer was made though a New York ship brokerage firm, W. R. Blackburn & Co., which had these craft on its list of available vessels. This offer was transmitted to Boston, but was rejected as inadequate. Further negotiations followed.

Early in February, 1952, Mr. Gustav E. Petterson, President of Estrella, who also acted as a representative of Astral, came to Baltimore and made a preliminary inspection of the vessels there. On February 6, 1952, Messrs. Petterson and Anderson, acting as representatives of Astral, conferred with officers of Boston and its counsel at Boston's office in Baltimore. A proposed contract was drafted at this conference which provided, among other things: (1) for the sale of the three vessels then in the harbor of Baltimore on an "as is where is" basis, at the price of $400,000; (2) for the purchaser to obtain approval of the transfer, with the cooperation of

the vendor; (3) for the purchaser to deposit in escrow with a Trust Company in Baltimore a fund of $80,000; (4) for inspection of the frigates by the purchaser, with the right to reject any of them whose condition might be unsatisfactory, subject to the further provision that the rejection of any one of the three would operate as a rejection of all and would terminate the contract; (5) for the delivery of the vessels and bills of sale, and payment of the balance of the purchase price within fifteen days of the signing of the contract or upon obtaining Government approval of the transfer; (6) for returning the moneys remaining in the escrow fund if such approval was not obtainable; and (7) that if the purchaser defaulted in the payment of the purchase price, the amount of the deposit remaining in escrow should be paid to the vendor as liquidated damages. Other provisions dealt with the payment of towing, shifting and drydocking charges for inspection purposes, the payment of a commission to the brokers, the use to which the vessels were to be put, the law to govern the interpretation or construction of the contract, which was to be the law of Maryland, and the retention of title by the vendor and the right of resale in case of default by the purchaser. These latter provisions were either the same or not materially different from those dealing with the same subjects which were embodied in the agreements later executed, and for that reason are not further commented upon at this point.

On the next day, February 7th, Mr. Anderson, accompanied by Mr. Blackburn, conferred with Mr. Anderson's and Astral's counsel in New York at the latter's office. Several changes in the proposed contract were suggested, Boston was advised of them and a further conference was held on February 11th, 1952, in New York at the office of Astral's counsel. This conference was attended by Mr. Blackburn, the broker, by counsel for Astral, counsel for Boston, an officer of Boston and Messrs. Anderson and Petterson, as representatives of Astral.

At this conference the proposed contract drafted on February 6th was revised; and, among other changes, it was split into two parts, one of which was dated February 18th and the other February 19th, 1952. These two agreements (apart from a notification later referred to) constituted the contract between the parties. They were subsequently executed by Astral in Panama and apparently on the same date, which is not shown but which was prior to February 23, 1952. They were executed substantially simultaneously by Boston at its office in Baltimore on February 23, 1952.

The first agreement (dated February 18) provided for the sale by Boston and the purchase by Astral of "one or more" of three named frigates then in the harbor of Baltimore on an "as is, where is" basis, at the price of $400,000 if all three were purchased, $270,000 for two if only two were purchased, and $137,500 for one if only one were purchased. Subsequent provisions called for Astral to inspect the ships within twenty-one days after both parties signed the contract and required Astral to notify Boston within a time limit of its acceptance or rejection of one, two or three of the vessels. Astral had the right to inspect the vessels afloat or on drydock and to "reject one or more of these frigates if the condition of such is unsatisfactory to the Purchaser." There were further provisions with regard to the payment by Boston or Astral of the cost of towing, shifting and drydocking the vessels, depending upon the number of them which Astral might reject or accept.

Other provisions of the first agreement required Astral to deposit in escrow the sum of $80,000 with a Trust Company in Baltimore. This deposit was required to be made (and was made) on the signing of the contract by both parties. The fund was to be paid over to Boston, together with other funds to be furnished by Astral necessary to make up the purchase price of the vessel or vessels purchased, on delivery of proper bills of sale for the vessel or vessels purchased "after Government permission for the transfer has been obtained." If

such permission was not obtained within thirty days of the signing of the contract by both parties, the escrow fund was to be paid over to Astral, less any towing, shifting or drydocking costs chargeable to and not already paid by Astral. The liquidated damages provision of the draft of February 6th was eliminated.

Paragraph 2 of the first agreement provided that "Permission for change of flag of these frigates to Panama shall be obtained by the Vendor with the co-operation of the Purchaser," thus reversing the corresponding provision of the February 6th draft.

Under Paragraph 9 Astral "warrants that on completion of this purchase the vessels will be used by it for the transportation of passengers or property in foreign commerce."

By other provisions title to the vessels was to remain in Boston until payment of the full purchase price in cash, and in case of failure of Astral to carry out the contract Boston might sell to others any one or all of the frigates for its own account. Boston was also to pay a 5% commission to W. R. Blackburn & Co. "as brokers for distribution."

Paragraph 11 reads as follows: "In case of enforcement of this contract, or dispute as to interpretation or construction of this contract, the substantive laws of the State of Maryland, United States of America, shall apply."

The second document, dated February 19th, 1952, provided as follows:

"1. It is hereby mutually agreed between the parties hereto that the agreement heretofore executed between them dated February 18th, 1952, for the purchase of one or more frigates, shall remain in full force and effect between the parties for an additional period of forty-five days notwithstanding the clause in the said agreement providing that it shall be void if the approval of the Government to the transfer shall not be obtained within thirty days from the signing of the said agreement.

"2. If either or both the Maritime Administraiton or the United States Navy has jurisdiction over this transfer, and approves said transfer subject to conditions prescribed by them or either of them with respect to future use and disposition of any or all of these vessels, such approval will amount to approval of the United States Government as provided for in the contract dated 18th February, 1952."

Following the conference of February 11th, W. R. Blackburn & Co., which held an exporter's license, filed applications with the State Department for licenses for each of the three vessels "to export arms, ammunition and implements of war." These applications were dated February 13, 1952. Mr. Blackburn testified that he obtained the information contained in the responses concerning Astral from Mr. Anderson. Item 9 inquired the specific purpose for which the material was required and the name and address of the ultimate consumer abroad. The answer was "To be converted to refrigerated banana carrier in the United States or Canada for the purchaser who is the ultimate consignee." At a later point (under Items 14 and 15 relating to quantity and commodity), it was stated, "Sold for conversion to refrigerated banana carrier before leaving the United States or Canada depending on where lowest price received for conversion. All armament removed. Conversion cost has been estimated at approximately $300,000."

On or about February 28, 1952, Mr. Petterson and a Mr. Hurst, who was a marine surveyor acting for Astral, inspected the three vessels in drydock in Baltimore, and on February 29th applications to the Maritime Administration for transfer of the frigates were executed in Baltimore on behalf of Boston and were signed on behalf of Astral by Mr. Petterson. On the same day Astral's Board of Directors held a meeting in Panama and authorized the purchase of three vessels for the Company and the transfer thereof to the registry and flag of Panama and also authorized the granting

of a power of attorney, which was executed and recorded on that day, empowering Gustav Petterson (described as "of New Jersey") to effect the authorized purchase and transfer of vessels "under the terms and conditions which he believes will best serve the interest of" Astral.

On March 20, 1952, the State Department granted the export license applied for under date of February 13th.

On March 21, 1952, Mr. Petterson wrote a letter to Boston on the letterhead of Estrella notifying Boston that Astral would buy all three frigates mentioned in the agreement of February 18th, 1952.

On April 9, 1952, the Maritime Administration approved the sale of the vessels to Astral and the proposed transfer of flag and registry of the frigates upon certain conditions among which were the following:

(1) That the vessels be converted in a United States shipyard;

(2) That for the duration of the National Emergency proclaimed by the President on December 16, 1950, there should be no change in the ownership or registry of the vessels nor should "there be any transfer of stock interest in * * * [Astral] to persons not citizens of the United States without the prior approval of the Maritime Administration."

(3) That in the event of default in the observance of the above conditions or certain others, Astral should pay to the Maritime Administration the sum of $25,000, as liquidated damages and not as a penalty, for each vessel involved in the default; and

(4) That Astral and a surety company licensed by the United States Treasury should execute and deliver to the Maritime Administration a bond in the amount of $75,000 to secure Astral's performance and observance of the prescribed undertakings and conditions, or that Astral deposit cash or Government bonds. All of the above mentioned conditions, except that prohibiting a change of ownership or registry of the vessels without the consent of the Maritime Administration are now ob-

jected to by Astral. The conversion and stock transfer conditions were objected to at once. Certain other conditions requiring Astral to sell or charter the vessels to the United States and prohibiting their use for purposes forbidden to United States flag vessels under certain orders of the Department of Commerce, were also conceded to be in order under the terms of the contract between Boston and Astral.

Efforts to induce the Maritime Administration to recede from the conditions to which Astral objected were not successful. Astral claimed that it was discharged from any obligation under the contract by reason of these conditions, and Boston took the opposite position. Boston eventually sold the vessels at a public sale, bid them in itself and scrapped them. No question is raised with regard to the propriety of the sale or the adequacy of the price bid by Boston. Neither is there any question as to the amount of damages, if Astral is liable to Boston under the contract.

There was testimony by an Administrative Assistant employed by the Maritime Administration and there was a letter from its General Counsel to one of Boston's attorneys to the effect that the conditions imposed as to the conversion of the frigates and as to transfers of stock of Astral were usual. The Administrative Assistant also testified that all of the conditions were usual in the case of naval vessels of more than 1,000 gross tons, and that the Maritime Administration did not give consent to the transfer of the frigates here involved until it had ascertained that the State Department had granted export licenses for these vessels and that copies of such licenses were in the Maritime Administration's files.

There was also testimony to show that Astral sought bids on conversion from several American and Canadian shipyards and that an American yard (the Bethlehem Steel Company's Key Highway yard in Baltimore) was the low bidder. It is not clear whether bids were obtained from yards in other countries, but there was testimony by Mr. Petterson to indicate that Astral was

considering having the conversions made in a Scandinavian or other European yard, where the cost would be much less than in the United States, and that Astral had sought and obtained bids for towing the frigates across the Atlantic. Bethlehem's bid for all three vessels was at the rate of $420,000 per vessel, or $120,000 per ship in excess of the estimated cost stated in the application for the State Department export license.

The first question of law is whether the contract was or was not made in Maryland. There is no room for doubt that some obligations were imposed and became effective as soon as Boston signed the contract in Maryland. Among these was Astral's obligation to put up the $80,000 escrow fund with the Union Trust Company of Maryland at one of its offices in Baltimore, which was immediately complied with. Another was Astral's obligation to inspect the vessels and to notify Boston within twenty-one days thereafter of its acceptance or rejection of one, two or three of them. This latter obligation Astral met within the time limit by Mr. Petterson's letter of March 21, 1952, notifying Boston of Astral's acceptance of all three. This notification was received by Boston at its office in Maryland. Whether the contract is construed (1) as creating an obligation on Astral's part to purchase all three vessels, defeasible, however, as to any one or more of them if they should be found upon inspection by Astral to be in unsatisfactory condition, or (2) as granting an option to Astral to purchase one, two or all three by notifying Boston in writing within the time prescribed of its election to buy one, two or three, we think that the contract was made in Maryland. In either event, in our view, the final act necessary to the completion of the contract—that is, to make it a binding obligation—was done in Maryland, and Maryland is consequently the place where the contract was made. *Sun Insurance Co. v. Mallick,* 160 Md. 71, 153 A. 35; *Union Trust Co. v. Knabe,* 122 Md. 584, 89 A. 1106; *1 Williston on Contracts* (Rev. Ed.) Section 97.

Under the first of the two suggested constructions there would appear to be no basis for a contrary contention. Under the second construction, however, Astral contends that the original contract amounted only to an offer by Boston to sell the frigates and that Astral accepted this offer by mailing an acceptance in Louisiana, and that Louisiana is consequently the place of the making of the contrat. We do not agree. Even if the agreement dated February 18th be considered as not amounting to a contract for the sale of the vessels, but only as the grant of an option to buy them, the terms of that "option" required Astral, if it elected to purchase, to notify Boston in writing of its acceptance of one, two or three vessels. This, we think, contemplated not merely the mailing of a letter from Panama, New Orleans or anywhere else, but the actual receipt of such notice by Boston. This took place in Maryland.

As is said in *1 Corbin on Contracts* (1950 Ed.), Section 264:

"But when, by the terms of an already consummated contract it is provided that one party shall have the power to produce certain legal results by giving notice, it is usually held that this means notice received in fact and not merely notice mailed * * *. The rule that an acceptance by post is operative on mailing was itself subjected to severe criticism; and even though it may now be regarded as settled, it should not be extended to notice of acceptance in already binding option contracts."

See also 1 *Williston on Contracts* (Rev. Ed.), Section 87, note, page 248.

Since we hold that the final act which made the agreement a binding contract took place in Maryland, the cases of *Park Beverage Co. v. Goebel Brewing Co.*, 197 Md. 369, 79 A. 2d 157, and *Cole v. Randall Park Holding Co.*, 201 Md. 616, 95 A. 2d 273, cited by the appellant, involving situations in which preliminary negotiations took place in Maryland, but final arrangements were effected in other states, are not applicable.

The second question is whether or not Code (1951), Article 23, Section 88 (d) is constitutional, as applied to the facts of this case. In the *Park Beverage Co.* case just referred to, this Court found it unnecessary to pass ·upon the validity of this Section because the contract there involved was not made in Maryland and the Section was, therefore, inapplicable. In the instant case, however, our holding that the contract was made in Maryland brings the question up for consideration. If the statute is invalid, the judgment of the lower court must be reversed and the suit dismissed; and, on the other hand, if we have jurisdiction to determine the case on the merits, such jurisdiction must be founded upon the validity of the statute.

The text of Section 88 (d) is as follows:

"Every foreign corporation shall be subject to suit in this State by a resident of this State or by a person having a usual place of business in this State on any cause of action arising out of a contract made within this State or liability incurred for acts done within this State, whether or not such foreign corporation is doing or has done business in this State."

This provision was first enacted by Chapter 504 of the Acts of 1937, and it has remained unchanged since that time. That Act made considerable changes in the laws relating to the amenability of foreign corporations to suit in Maryland, and also made some changes in the provisions for service of process. In an article entitled *"Jurisdiction of Maryland Courts over Foreign Corporations Under the Act of 1937"*, 3 Md. L. R. 35, Professor Reiblich presented a comprehensive analysis of the provisions dealing with jurisdiction and of the constitutional questions raised thereby. He suggested several relatively minor amendments to the new law in order to reduce or avoid the danger of successful attacks on constitutional grounds, and one amendment made in 1941 and another in 1943 seem to have been directed to this end. Two others were included in the major revision of the General Corporation Laws effected by Chapter 135 of the

Acts of 1951. None of these changes amended Section 88 (d) nor did Mr. Reiblich recommend any changes therein, though he clearly recognized the possibility of attack upon it.

The attack in this case on the constitutionality of Section 88 (d) is limited to considerations of due process under the Federal and State Constitutions, and on this issue it is confined to the question of the jurisdiction of the State of Maryland to subject Astral, on the facts here presented, to suit in a Maryland court. No objection is made to the sufficiency of the provisions of the Maryland law with regard to the giving of notice of the suit, and no attack is made under the commerce clause of the Federal Constitution.

Section 88 (d) is subject to a separability clause Code (1951), Article 23, Section 1 (h) reading as follows:

"If any provision of this Article or the application of such provision to any person or circumstance shall be held invalid, the validity of the remainder of the Article, and the applicability of such provision to other persons or circumstances, shall not be affected thereby." (A virtually identical clause was contained in Section 13 of Chapter 504 of the Acts of 1937.) By reason of this clause, we are not concerned with any factual situation other than that here presented. We may agree with the appellant that the mere mailing in Maryland of acceptance of an offer would not be sufficient to sustain a suit brought here under the statute against the challenge of due process, but that does not dispose of this case.

Undoubtedly, we are in a comparatively novel field. Section 88 (d) by its terms extends jurisdiction over foreign corporations in suits by residents or by other persons having a usual place of business in Maryland to cover causes of action arising from contracts made or acts done in this State, regardless of whether or not the foreign corporation is doing business or has been doing business in this State. In discussing the due process aspect of this extension Professor Reiblich says:

"This is an apparent attempt to extend to corporations a basis of jurisdictional power recently recognized for natural persons [citing *Hess v. Pawloski,* 274 U. S. 352, *Doherty v. Goodman,* 294 U. S. 623, and referring for comparison to other authorities]; but to extend it in a more extensive fashion than has as yet been recognized in any opinions of the courts.

"As a bar to the validity of sub-division (d) there stand repeated statements of the courts to the effect that in the absence of 'consent' or 'doing business' there is no basis for the assertion of jurisdiction over the foreign corporation.

"The old cases do not stand as authority on this new development. They were not decided under statutes which attempted to assert (and at the same time limit) jurisdiction as to causes of action arising out of the particular act done. They were attempting to assert a general personal jurisdiction based on the doing of business as a contact sufficient to support it.

"The question of * * * [the] extension to corporations [of jurisdiction based on the doing of an act or acts (not amounting to 'doing business' within the State, but limited to causes of action arising out of that very act or acts)] must be answered by determining whether it is unreasonable to subject the foreign corporation to similar control. It is not apparent why such assertion of power is any less reasonable as applied to corporations than as applied to individuals."

After raising the question whether or not such jurisdiction may extend to any kind of act done within the state and concluding, on the basis of the *Hess* and *Doherty* cases that it cannot, he suggests that personal jurisdiction over a foreign corporation (or individual) as to causes of action arising out of an act done within the state may properly be asserted "to the extent that it is a reasonable exercise of the state's regulatory control under all of the facts involved." This, we think, closely approximates the test laid down in *International*

*Shoe Co. v. Washington,* 326 U. S. 310, decided about seven years later.

*Pennoyer v. Neff,* 95 U. S. 714, no longer fully states the rules of due process as applied to suits against non-resident individuals. *Kane v .New Jersey,* 242 U. S. 160, and *Hess v. Pawloski,* 274 U. S. 352, firmly established the rule that a non-resident motorist using the highways of a state other than his own may be subjected to suit in the courts of that state on a cause of action arising out of his operation of a motor vehicle on its highways. Beginning (as in the *Kane* case) with the type of law which required, as a condition to the use of the highways of the state, the actual appointment of a state official as the agent of a non-resident motorist upon whom process might be served, the usual type of state law soon became (as in the *Hess* case) that under which the non-resident motorist's use of the highways of the state was deemed the equivalent of the actual appointment of such an official. *Doherty & Co. v. Goodman,* 294 U. S. 623, likewise established the amenability to suit within a state of a non-resident individual carrying on business through an agent in that state, if process is served on his agent there, even though the non-resident principal has not authorized the agent to accept service of process. In the *Doherty & Co.* case, *Flexner v. Farson,* 248 U. S. 289, was explained on the ground that the person upon whom service was made in that case had ceased to be an agent of the non-resident individual defendant prior to the time when service was made upon him.

In Maryland the validity of our statute making non-resident motorists amenable to suits in courts of this state on causes of action arising out of their operation of motor vehicles in this state has been upheld. *Employers Liability Corp. v. Perkins,* 169 Md. 269, 181 A. 436.

Just as the doctrine of *Pennoyer v. Neff* dealing with non-resident individuals has undergone limitation, so has the doctrine of such cases as *Phila. & Reading Ry. Co. v. McKibbin,* 243 U. S. 264, and *Rosenberg Bros. & Co., Inc. v. Curtis Brown Co.,* 260 U. S. 516, relating to

foreign corporations. The test of jurisdiction is no longer solely or necessarily whether the acts of the foreign corporation within the state amount to "doing business." It may be noted in this connection that the Maryland General Corporation Laws specifically provides that an isolated transaction shall not constitute doing business. (Article 23, Section 84 (b) (6) ). This clearly exempts a foreign corporation engaging in a single transaction from the general requirements to qualify and to appoint a resident agent, which foreign corporations doing an intrastate business must meet. It likewise serves to exempt the "one-transaction" foreign corporation from the broad amenability to suit in Maryland which attaches to foreign corporations "doing business" in this state, whether they duly qualify or not. It also points up the narrowness of the field in which the "one-transaction" foreign corporation is amenable to suit in Maryland—that is in a suit by a resident or a person having a regular place of business in Maryland arising out of a contract made or an act done in Maryland.

The non-resident motorist cases have shattered any argument to the effect that a single transaction by a non-resident may not be made the basis for amenability to suit in the state where the transaction occurred. The *Doherty & Co.* case has rendered untenable any contention that a contract made within a state cannot serve as the basis for suit in that state against a non-resident party to the contract.

The appellant distinguishes these cases on the ground that they involve applications of the police power, its exercise in the *Doherty & Co.* case being based upon the state's concern with the sale of securities. The appellant points out that no case decided by the Supreme Court has upheld a suit such as this based upon a single contract, which the appellant claims is not within the scope of the police power. From the absence of such authority, the appellant argues that the power of the

state to entertain this suit cannot be sustained. This, we think, is not a necessary consequence.

The rule announced by the Supreme Court in *International Shoe Co. v. Washington*, 326 U. S. 310, is that by which we believe the jurisdiction of Maryland is to be tested in this case. There the foreign corporation, which sought to avoid both local taxation and amenability to local suit, was found to be engaged in systematic and continued activities within the state, and hence that case is not comparable on its facts to the instant case. On the other hand, the test applied was not expressed in terms of whether or not the foreign corporation was "doing business" in the state. (See *Thomas v. Hudson Sales Co.*, 204 Md. 450, 105 A. 2d 225.) On the contrary, the Supreme Court laid down a much broader test which we believe to be applicable here. The Court said:

"Due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' * * *.

"Finally, although the commission of some single or occasional acts of the corporate agent in a state sufficient to impose an obligation or liability on the corporation has not been thought to confer upon the state authority to enforce it, *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U. S. 516, other such acts because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit. * * *

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit and those which do not cannot be simply mechanical or quantitative. * * * That clause [due process] does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties or relations. Cf. *Pennoyer v.*

*Neff* \* \* \* [95 U. S. 714] ; *Minnesota Commercial Association v. Benn,* 261 U. S. 140.

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations and so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."

The only case previously decided actually turning upon what is now Section 88 (d) is *Johns v. Bay State Abrasive Products Co.,* 89 Fed. Supp. 654 (D. C., Md.), in which Judge Chesnut upheld the statute as applied to a tort claim based upon a liability incurred in Maryland. Judge Chesnut carefully reviewed and analyzed the cases bearing on the question. He concluded that on the facts, as they appeared on a preliminary motion, one of the defendant non-resident corporations was doing more in Maryland than simply engaging in one isolated transaction, though it was not "doing business" in Maryland. He relied particularly upon the *International Shoe Co.* case. *United States v. Scophony Corp.,* 333 U. S. 795, also referred to by Judge Chesnut, is concerned with a question of venue, rather than jurisdiction, but the opinion contains this brief summary of the transition through which theories relating to the amenability of a foreign corporation to suit in a particular jurisdiction have gone: "The conventional rationalization applied equated 'found' in sequence to 'presence,' to 'doing business by its agents there,' to 'of a character warranting inference of subjection to the local jurisdiction.' "

It is against this background of development of the law that the validity of Section 88 (d), as applied to the facts of this case, must be determined. On the basis of contacts with the State of Maryland, we find that the vessels which were the principal subject matter of

the contract were here (and had been here for years), that one of Astral's representatives came here to inspect them, that this inspection was followed by a visit by him and by another representative of Astral to Maryland and negotiations between them and Boston's representatives, which reached a general agreement as to price and as to many of the terms of the final contract, including an express provision that the law of Maryland (changed in the final contract to read "substantive law") should be controlling in the construction or interpretation of the contract, and a provision for establishing an escrow fund here (though certain material terms of the escrow provision were later altered), that the contract after being executed by Astral in Panama became effective when executed in this State by Boston, that the physical documents embodying the contract were brought into this State by a representative of Astral for the purpose of their being so executed, that this representative also brought with him and delivered to the escrow agent in Maryland a cashier's check for $80,000 to establish the escrow fund called for by the contract to be established here, and a letter of instruction from Astral with regard thereto, that further, in accordance with the contract, Astral inspected the vessels in Baltimore, that it sent to Boston at its office in Maryland a notification of acceptance of all three vessels, that it signed in Maryland, as the prospective purchaser, the application which Boston, as seller, was required to make to the Maritime Administration for transfer of the vessels, and that the place of performance of the contract—that is, the place for the delivery of the vessels and for payment of the purchase price—was Maryland.

All of these things, (and also some local negotiations between Astral and Boston with regard to the conditions imposed by the Maritime Administration, the local character of which seems to us unimpressive), it is true, related to what was but a single transaction; but all told, they add up to considerable contact with this State

and considerable reliance upon its laws and the protection which they afforded. The statute in question is not within the scope of a narrow meaning of the police power, as the non-resident motorist statutes, statutes regulating the sale of securities and statutes (as in *Pennsylvania Fire Ins. Co. v. Gold Issue Mining Co.,* 243 U. S. 93, or *Travelers Health Ins. Co. v. Virginia,* 339 U. S. 643) regulating the insurance business clearly are.

Within the fields of these cases we take it that the validity of statutes subjecting non-residents to local suits is settled. Beyond those limits, the question under the rule of the *International Shoe Co.* case is the sufficiency of the local contacts to warrant subjecting the non-resident to suit. We may note that in the case of foreign corporations a less rigorous standard may suffice than in the case of individuals, for the reason that a state is generally without power to exclude an individual non-resident from doing business or making contracts in the state, but may generally completely exclude foreign corporations or may admit them only subject to conditions. See *Reiblich, op.* cit., at 3 Md. Law Review 71.

The same type of considerations as are pertinent under the doctrine of *forum non conveniens* are applicable in balancing the respective interests of the local plaintiff and the foreign corporation, and in determining whether the latter's contacts with the state are sufficient to warrant its being held accountable in a local suit. These considerations of convenience, though lightly dismissed by the appellant, have been accorded statutory recognition in U.S.C.A., Title 28, Section 1404 (a), enacted in 1948, and in Article 23, Section 88 (b) of the Maryland Code, as enacted in 1951. The application of such considerations to the present case may be seen from the fact that every one of the witnesses who testified was a citizen or resident of the United States. Five of them lived or were employed in Baltimore, one in New York, one in Washington and one in New Orleans. All but the last were within less than two hundred miles of the place of trial. There was no witness from Panama, and

the only documentary evidence contained in the joint appendix which was produced from there was small in volume and easily procurable and transmissible. It covers two and a half pages in a joint appendix of a hundred and seventy-five pages.

Professor Reiblich, in his article in 3 Md. Law Review, at 70, concluded his discussion of the present Section 88 (d) and due process by saying that it "represents a sound social policy and should be sustainable against the due process objection." In support of this view he relied upon the acceptance of such a rule by other countries, upon the state's interest in affording to its citizens the convenience of litigating in their own state disputes growing out of contracts made there and in seeing that the contract is controlled by the law which it regards as applicable, and upon the convenience of the plaintiff as to the place of trial being sufficient to tip the scales of due process in his favor, in view of the defendant's having come to the plaintiff's jurisdiction to make a contract with him. All of these factors are present in the instant case and one of them (the applicability of Maryland law) is specifically provided for by the contract.

A note in 38 Columbia Law Review 1060, entitled *"Revision of the Maryland Corporation Law: An Advance,"* in dealing with the jurisdictional and service of process provisions of Chapter 504 of the Acts of 1937 which were applicable to foreign corporations, among other things, described subsection (d) of what is now Section 88 as "unique" and concluded with this paragraph:

"As for the 'contracts made' within the state, it is equally an 'act within the jurisdiction', but no case has been decided on the point. But as jurisdiction over the act done within the state may be justified because the state ought to have some measure of rule over activities within its precincts, so jurisdiction over contracts is supportable on the ground that if the state may make the law of the contract, it may properly lay claim to prior

rights in administering the law. As for protection of its residents, there could surely be no distinction between the causing of tort or of contractual harm.* The concept embodied in the subsection is at best embryonic, but may soon find expression in the cases."

A note on *Johns v. Bay State Abrasive Products Co.*, *supra*, in 64 Harvard Law Review 500-502, approves the result of that case and states: "Although the court carefully limited its approval of the statute to the factual circumstance of continuous solicitation within the state, it would seem that even without the slight solicitation present, the statutory declaration that Maryland has jurisdiction to entertain actions arising out of solitary acts within the state satisfies due process." This note is also interesting in its reference to the development of the law with regard to the amenability of a foreign corporation to a local suit for "doing business" as signifying an implied consent to suit or as manifesting "corporate presence" and in its reference to the somewhat fictional character of the non-resident motorist being deemed to have appointed a local official as his agent for service of process. The note then goes on to say: "But the fictional emphasis appears to have ended in favor of a rule more in accord with the basic due process concept * * *," citing the *International Shoe Co.* case.

The complete disappearance of fictional consent in the non-resident motorist cases is shown by the opinion of the Supreme Court delivered by Mr. Justice Frankfurter in *Olberding v. Illinois Central Railroad Co.*, 346 U. S. 338. There is no pretense of fictional consent in the instant case, and the course of the law, culminating in the *International Shoe Co.* case and in the *Olberding* case makes it clear that no consent, actual or fictional, is needed to sustain jurisdiction. (The *Olberding* case turned on the absence of consent as showing that a non-resident motorist, though amenable to suit in a court

---

* "Suppose, for example, a driver for a foreign trucking corporation negligently injures a pedestrian in Maryland and at the same time runs up a large bill with a Maryland garage."

of the state where the accident occurred, had not consented to be sued in a court of that state and hence had not waived the federal venue statute.)

In *Smyth v. Twin State Improvement Corp.*, 116 Vt. 569, 80 A. 2d 664, the Supreme Court of Vermont upheld a statute somewhat similar to Section 88 (d) and sustained jurisdiction in a tort case brought by a resident of Vermont growing out of an isolated transaction. There was no finding, nor did the statute require, that the act giving rise to such a suit be of an inherently dangerous nature. The contrary seems to have been the fact, since the action was for negligently damaging the roof of the plaintiff's home.

See also *Gillioz v. Kincannon*, 213 Ark. 1010, 214 S. W. 2d 212, also a tort case. The nature of the act does not appear to have been considered important, and the police power was considered to warrant the statute. (As to the possible breadth of the police power, see *Sligh v. Kirkwood*, 237 U. S. 52, at 59. This raises a question which we do not think it necessary for us to attempt to answer in this case.)

We are aware of the American Law Institute's having declined to take a position on the question here present. We have no quarrel with the Institute for its prudent reluctance to rush in where we feel required to tread, but we do not see how its refusal to do so can support either side.

It is our opinion that on the facts of this case as we have set them forth above, the contacts of Astral with the State of Maryland were sufficient to sustain a suit against it in this State under the test of due process stated in *International Shoe Co. v. Washington*, 326 U. S. 310.

The final question is whether the conditions upon the transfer of the vessels imposed by the Maritime Administration went beyond the "conditions * * * with respect to the future use and disposition of any or all of these vessels" to which Astral assented under the agreement dated February 19, 1952. The conditions in issue are

(1) that requiring conversion of the frigates to be made in an American shipyard, (2) that prohibiting any transfer of stock interest in Astral, and (3) that providing for liquidated damages of $25,000 in respect of each vessel for any breach of conditions and the related requirement for a surety bond or other security in the aggregate amount of $75,000 ($25,000 per vessel) to guarantee adherence to all of the conditions.

The matter of conditions upon the transfer which might be imposed by the United States was not mentioned in the first draft of the contract. Under that draft it was recognized that the approval of the United States would be required and Astral was to obtain it with the cooperation of Boston. This provision was reversed in the final agreement, because Boston had learned that the seller would have to obtain such consent. Boston also learned that conditions would, in all probability, be imposed; and during the conference of February 11th, after Boston had brought the matter up, Astral's counsel ascertained that if the Maritime Administration had authority over the transfer, some conditions would be imposed. The wish to avoid inviting or seeming to invite their imposition was the reason for splitting the contract into two agreements, and doubtless it was also the reason (though there is no testimony to that effect) for neither party making a direct inquiry on the subject. Instead, the parties wrote into the agreement a statement of the kinds of conditions which, if imposed, would not avoid the contract.

A study of the pertinent statutory provisions relating to approval by the Maritime Administration—Sections 835 and 839 of Title 46, U.S.C.A.—and of the Presidential Proclamation of a National Emergency, dated December 16, 1950, which brought these statutory provisions into operation throws no light on the kind of conditions which might have been expected. Section 835 required the approval of the Maritime Administration for the proposed transfer and Section 839 authorized that body to grant its approval either "absolutely or upon such

conditions as * * * [it] prescribes." Section 13 of the application for such approval which Boston executed and Astral also signed did give warning that conditions might be imposed, but spoke only of restrictions against larger vessels trading with United States ports for some specified period after transfer to foreign registry, or other conditions for the benefit of the American merchant marine. It also stated that a surety bond might be required to secure performance of "such conditions"— presumably meaning those mentioned.

While thus in the dark as to what the conditions might turn out to be the parties made an agreement which involved some risk and some protection to each side. Astral took the risk of whatever conditions with respect to the future use and disposition of the vessels the Maritime Administration might impose, but it assumed no risk as to conditions not within that field. Boston, for its part, gained protection as to any conditions within the agreed field and took the risk of having the contract avoided if the conditions went outside that field.

Before proceeding to analyze any of the conditions actually imposed, we may observe that the contract, by its terms, is to be construed according to the law of Maryland. Neither the reasons which may have impelled the Maritime Administration to adopt the conditions which it prescribed nor any views entertained by any of its officials as to the proper interpretation of terms used in the contract between Astral and Boston can be considered as determinative of the law of this State with regard to the meaning of the contract. Certain views expressed in 1952 in a letter from the then General Counsel of the Maritime Administration have, in effect, been adopted in the argument of Boston. We deem it unnecessary to determine whether that letter was properly admitted in evidence, but do not wish to be understood by this reference to it as regarding it as properly admitted. Even if the words construed in that letter had acquired a meaning as a matter of usage by the Maritime Administration, we hardly see how that usage

(if it existed) could affect the meaning of the contract between parties who knew nothing of it, or could be binding upon them. *Mercantile Trust Co. v. Rode,* 137 Md. 362, 370, 112 A. 574. See also *Restatement of the Law of Contracts,* Section 235 (a) and Comment (b) thereon.

With regard to the restriction against any transfer of stock of Astral, without the prior consent of the Maritime Administration, during the National Emergency proclaimed by the President on December 16, 1950, Boston argued, and the trial court after the hearing on the merits held, that this was a condition with respect to the use and disposition of the vessels, because a corporation may dispose of its assets in two ways—either by a sale of the assets or by a sale of the stock in the corporation. In adopting this reasoning the trial court seems to have overlooked the fact that a sale of stock transferring control of corporate assets is made (except in very unusual cases) by one or more stockholders who own the stock, and is not made by the corporation.

The General Counsel of the Maritime Administration in 1952 reached the same result by a somewhat different argument, which Boston also presses. He stated: "This condition is attached because the holders of the stock of a corporation not only directly affect the character of the corporate buyer but also are in a position directly to control the future use and disposition of the vessel for which permission to transfer foreign is given. Obviously, the stock control, whether by virtue of a majority ownership or by virtue of a minority interest, is a factor directly affecting the future use and disposition of the vessels."

Neither of these arguments is sufficient, in our view, to overcome the simple fact that the contract binds Astral to assent to conditions with respect to the future use and disposition of the *vessels,* but says nothing at all about *transfers of stock.* If such transfers were intended to be covered they could easily have been mentioned.

The contract is between Astral, a corporation, and Boston, a corporation, not between Astral and its stockholders, on the one side, and Boston on the other. A corporation cannot, of its own motion and without authority from its stockholders so to do, enter into a valid contract restricting the right of its stockholders to transfer their stock. At least, it cannot do so under the law of Maryland, and if the law of Panama is different on this point, there is no proof thereof before us. Astral made no such agreement in its dealings with Boston and gave no commitment to obtain such an agreement from its stockholders. Of course, it might have subjected itself to liability for the acts of others, but we do not find that it undertook to do so.

The difference between ownership of shares of stock in a corporation and ownership of a proportionate share of the assets of the corporation, requires no elaboration; nor does the difference between the sale by a corporation of assets which it owns and the sale by one or more stockholders of the shares in the corporation which they own. True, either a sale of corporate assets or the sale of a controlling interest in stock of the corporation owning the assets may accomplish the transfer of control over corporate assets, but that still does not make a transfer or disposition of shares of stock in a corporation owning a vessel a transfer or disposition of the vessel. In this connection, it may be noted in passing that the Maritime Administration's letter stating its consent and the conditions thereto speaks in a single paragraph of a "change in the ownership * * * of said vessels" and also of "any transfer of stock interest in said corporation [Astral]," which indicates to us that they were regarded as two different things.

Boston's argument that any change in stock ownership may lead to a change in policy and hence to a change in the use or disposition of vessels owned by Astral has almost no apparent logical stopping point. Anything which affects Astral may affect the use for which it may think it desirable to employ its ships, and hence

virtually any condition could be supported by the same logic upon which Boston's contention as to a change in stock ownership rests. For example, borrowing money might lead to a creditor's insisting upon some change in Astral's use of its vessels. Conditions relating to influences upon uses, but not to actual uses themselves, are not, in our judgment, within the meaning of the clause of the contract now before us. New stockholder control or creditor control of Astral could not authorize Astral to depart from any conditions prescribed by the Maritime Administration and agreed to by Astral as to the uses for which Astral's vessel might be employed or with regard to the sale or charter of the vessels. We take the phrase "conditions with respect to future use and disposition of any or all of these vessels" to mean conditions with regard to their use or disposition by Astral or by any other owner or transferee acquiring them directly or remotely from Astral, and not as meaning any conditions which might possibly affect the use to which Astral or a future owner or transferee might wish to put them, regardless of whether or not such use was prohibited by any condition imposed by the Maritime Administration.

Since Astral was already engaged in business, the vessels would certainly not have constituted its sole assets, and a restriction against the transfer of any shares of its stock might deprive the two existing stockholders of freedom to realize upon assets having a value quite apart from any attributable to its ownership of these vessels.

It may be noted that Astral made no objection (nor do we think it could have done so successfully) to conditions which prohibited the use of the vessels in operations prohibited to American flag vessels under certain Department of Commerce orders or to conditions requiring the sale or charter of the vessels to the United States on the same terms as American-owned vessels. These conditions pertained directly to the use and disposition of the vessels by the owner thereof, and were

within the type of conditions to which Astral did assent under its contract with Boston.

The court will not, under the guise of construction, rewrite the contract which the parties have made. *Joffe v. Niagara Fire Insurance Company,* 116 Md. 165, 81 A. 286; *Cowan v. Meyer,* 125 Md. 450, 94 A. 18. Nor will the court reform the contract in the absence of proof of mutual mistake and of precisely what was the real agreement. *England v. Gardiner,* 154 Md. 510, 142 A. 625. Further citation of authority on these established rules would be only cumulative.

It is unnecessary to prolong this opinion further by discussing extensively whether or not other conditions objected to by Astral are conditions with respect to the future use and disposition of the vessels. We may observe, however, that we do not regard the term "use" as including "conversion," since the conversion of a vessel, in our estimation, is a preparation for use, but is not a use in itself. There is also at least a serious question as to whether or not the place of conversion bears such a relation to future use as to bring it within the scope of conditions with respect to future use. On the other hand, Astral's position on this matter does not appear to have been entirely consistent in view of the application filed with the State Department. There are also serious questions as to whether the liquidated damages provision is within the conditions assented to, and also the bond or other security provisions. Insofar as these provide a reasonable method of making effective conditions which are within the scope of the conditions to which Astral assented, they would, we think, fall within the agreed conditions; and it may be noted that Section 13 of the application to the Maritime Administration gave notice that a surety bond to guarantee performance of at least some conditions might be required. Insofar, however, as these provisions pertain to conditions outside the agreed field, they must also fall outside of it.

Since at least one of the primary conditions imposed by the Maritime Administration and the appurtenant provisions with regard to liquidated damages and security went beyond the conditions to which Astral assented, Astral was discharged from any obligation to purchase the vessels, and the judgment for the plaintiff must be reversed and judgment must be entered for the appellant.

*Judgment reversed, without a new trial, and judgment for the appellant, with costs.*

HENDERSON, J., delivered the following opinion, dissenting in part, in which HAMMOND, J., concurred.

Judge Hammond and I agree with the majority of the Court that the trial court obtained jurisdiction of the subject matter and the person of the defendant, and that there is no valid constitutional objection to the action upon a contract made in this state. We do not agree, however, that the defendant was relieved of its obligation to complete the purchase because of the condition imposed by the Maritime Administration that there should be no change in the ownership or registry of the vessels or "transfer of stock interest in * * * [Astral], to persons not citizens of the United States, without the prior approval of the Maritime Administration".

It may be noted that the original contract merely stipulated that the escrow fund was to be paid over on delivery of proper bills of sale covering the vessels "after Government permission for the transfer has been obtained." Paragraph 2 of the supplemental agreement provided that approval of the transfer by the Maritime Administration "subject to conditions prescribed * * * with respect to future use and disposition of any or all of these vessels" would amount to approval of the United States Government. The Maritime Administration did approve the transfer. If we assume that the clause describing the general nature of the conditions that might

be prescribed was a condition precedent, and in legal effect a stipulation that any condition of a kind not covered by the quoted clause, if prescribed, would avoid the contract, we think it involves no distortion of language to hold that "with respect to future * * * disposition of" the vessels, would include at least a transfer to aliens of a controlling interest in the corporation that, in substance if not in form, would effect a change in ownership of the vessels. In any event, we think the phrase is not so clear and unambiguous as to forbid resort to the surrounding circumstances as an aid to interpretation.

It seems clear from the record that both parties knew, or should have known, that such a condition was customarily imposed by the Maritime Administration, in connection with transfers of domestic vessels generally, and war vessels in particular. Indeed, in the case of vessels owned by domestic corporations, the federal statute requires approval by the Maritime Administration of transfers of stock in such corporate owners to aliens. Title 46, Section 835, U.S.C.. See also Sections 802 and 808, construed in *Meacham Corp. v. U. S.*, 207 F. (2) 535, 543, (C.A. 4th) (Soper, J.). Moreover, the application form of the Maritime Administration, executed by Astral, referred to these sections and called upon Astral to give the names, addresses, nationality and percentage of stock owned by its stockholders. In the light of these circumstances, it strains credulity to suppose that Astral intended the phrase to comprehend a condition on use as banana carriers that might frustrate the whole purpose of the sale, but not to comprehend the customary limitation upon future transfers of stock that was properly within the scope of the regulatory powers of the Maritime Administration. In this connection, it may be noted that the real motive that led Astral to a repudiation of the  sale was the simple fact that the cost of converting the vessels into banana carriers was greatly in excess of what it had estimated. This, of course, was an error of business judgment that would

274

afford no legal ground for relief. We cannot escape the conclusion that the objection to the restriction as to future stock transfers was a mere pretext, not going to the essence of the bargain, and that the condition was well within the contemplation of the parties in the use of the words "with respect to * * * disposition". We think the judgment of the trial court should be affirmed.