**SANDERS ASSOCIATES, INC.**

v.

**The GALION IRON WORKS & MANUFACTURING COMPANY.**

**Civ. A. No. 2156.**

United States District Court
D. New Hampshire.

Oct. 30, 1961.

Hamblett, Kerrigan & Hamblett, Robert B. Hamblett, Nashua, N. H., for plaintiff.

Sulloway, Hollis, Godfrey & Soden, Irving H. Soden, Concord, N. H., Porter, Stanley, Treffinger & Platt, Raymond H. Treffinger, Columbus, Ohio, for defendant.

CONNOR, District Judge.

The plaintiff, hereinafter referred to as "Sanders," a Delaware corporation with its principal place of business in Nashua, New Hampshire, has brought an action for breach of contract against defendant, hereinafter referred to as "Galion," an Ohio corporation with its principal place of business in Galion, Ohio. Service of process was made pursuant to Rule 4(d) (7) of the Federal Rules of Civil Procedure, 28 U.S.C.A., in accordance with the applicable state statute, N.H. RSA 300:11.

The defendant has filed a motion to dismiss and to quash service of process raising questions of jurisdiction, venue, and insufficiency of process. The defendant has also registered objection to certain affidavits submitted by the plaintiff on grounds that they are irrelevant to the issues raised in the motion and that they contain legal conclusions. Aside from any legal conclusions or material relevant only to the merits of the action which they may contain, they have been given consideration as well as that offered by the defendant. From the pleadings, depositions, exhibits, and affidavits, the following appear to be the pertinent facts.

Plaintiff's business is essentially the designing, engineering, and manufacturing of certain electronic and hydraulic devices. Defendant manufactures and sells motor or road graders and road rollers largely to users of such equipment in Ohio as well as to distributors both in and out of Ohio.

R. C. Hazelton Company, Inc., hereinafter referred to as "Hazelton" serves, per contract, as defendant's sole distributor in New Hampshire. All of defendant's products reaching New Hampshire were sold to Hazelton, f. o. b., Galion, Ohio.

On May 9 and again on June 12, 1957, certain of defendant's representatives came to New Hampshire to engage in discussions and negotiations looking toward the conclusion of a development contract, the purpose of which would be to design and produce a device to automatically control the slope of the blade or bulldozer attachment on Galion's road graders.

Shortly thereafter following oral authorization from defendant's vice-president to proceed with the initial steps of the program, the parties entered into a contract dated July 22, 1957, which contract was evidently sent to Galion by Sanders and signed by Galion in Ohio. By it, Galion agreed concurrently or within a short period of time to place an order for the development of two experimental "breadboard" models of the "blade slope control attachment"; Sanders agreed to make application for Letters Patent covering any patentable improvement directly resulting from the experimental work and to grant Galion an exclusive license to manufacture, use, and sell the device in the field of road graders.

On November 26, 1957, a second agreement styled as "supplemental" to the first was entered into which apparently was sent from Galion to Sanders and finally executed by Sanders in New Hampshire. By it, Sanders undertook to construct two "preproduction" models which were to be field tested by Galion in order to ascertain whether they performed in accordance with certain specifications drawn up by Sanders. Payment to Sanders was conditioned upon such performance after five hundred hours of testing.

Numerous other provisions are contained in the agreements which do not

require mention in this brief description.

. The nature of the agreements was such as to require frequent consultation between the parties and such consultation was largely carried out in New Hampshire. The majority of the meetings were engineering conferences generally between Galion's project engineer and employees of Sanders at Nashua. At other times, several officials of Galion came into the state to confer and witness demonstrations of the device, mounted on a Galion grader. It appears that such a grader was located in New Hampshire from August, 1957, until June, 1958.

Galion's only other New Hampshire contacts concerned its authorized distributor Hazelton. It, upon receipt of an order from a customer, purchased the required equipment from Galion, f. o. b., Galion, Ohio.

Galion furnished Hazelton a list of prices and available discounts. It reserved the right to sell direct to each state highway department of the several states and to the United States. Richard Hazelton, treasurer of Hazelton, knew of no such direct sales to the New Hampshire Highway Department.

Hazelton was permitted to solicit only its particular territory and this provision was apparently enforced. Galion's district representative, one Gillespie, stated in his affidavit that he did not exercise any general supervision over the performance of the agreement between the parties nor to his knowledge did any other representative of Galion.

Hazelton was obligated to keep on hand three motor graders and two road rollers of Galion's as floor stock, but Richard Hazelton indicated that they did not do so except for a brief period following the initial association of the parties. Hazelton was not permitted to sell any new motor graders or road rollers other than those of Galion. They carried other equipment of other companies, but nothing that competed with Galion products.

Hazelton was obligated to furnish Galion a monthly sales report showing sales for the preceding thirty days, inventory, unfilled orders, and estimates of future sales. Gillespie stated that he received monthly reports from Galion concerning Hazelton's sales showing numbers of dollars in rollers, graders, and parts.

Hazelton contributed to Galion advertisements along with other distributors and dealers, which advertisements appeared in trade journals which may have circulated in New Hampshire. Galion agreed to and apparently did supply advertising material to Hazelton, f. o. b., Galion, Ohio. Hazelton also purchased a motion picture film from Galion depicting the latter's equipment in operation.

Galion gave a six months warranty against defective material or workmanship. Hazelton serviced any complaints and apparently bore the labor costs involved.

Hazelton had the right, at its own expense, to request Galion to furnish a demonstrator or serviceman, but Richard Hazelton said they did not do so and maintained their own department furnished with parts acquired from Galion and maintained in stock as per the agreement. Under certain specified conditions, Galion agreed to repurchase, upon termination of the agreement, all new, current, unused, and salable service parts.

Upon request and at least partial reimbursement, Galion would make its plane available to distributors for the purpose of bringing customers or potential customers to Galion, Ohio, to witness demonstrations of Galion products.

Hazelton maintained its own credit arrangements with its customers which Galion did not oversee. Under its distributor agreement, Hazelton was obligated to provide inspection service for its vendees and to train employees of such vendee to "operate, lubricate and maintain such equipment correctly."

Inspection of the record discloses no reason to discount the following statement from defendant's memorandum in support of its motion to dismiss and quash service of process.

"Defendant maintains no bank account in New Hampshire, office, telephone listing, number and/or telephone. It has not advertised in New Hampshire through newspapers, radio or television or other media except to the extent that trade publications may be circulated in New Hampshire as well as many other states and except to the extent that it has sold promotional material to the distributor. None of defendant's officers or directors are residents of New Hampshire nor to its knowledge are any of its employees.

"Defendant has never made recourse to a New Hampshire court, New Hampshire law enforcement officer or threatened to do so. Defendant has never registered any of its products, trade marks or copyrights with the State of New Hampshire nor has it ever acquired vehicle registration plates in New Hampshire.

"Defendant is not licensed to do business in New Hampshire nor does it pay any New Hampshire taxes."

Galion's representative, Gillespie, who is paid by salary and by commission amounting to one-fourth of one per cent of sales to distributors in his territory plus a bonus arrangement proportionate to total sales of Galion in the United States, came into New Hampshire to deal with Hazelton's affairs on several occasions, sometimes alone and on other occasions accompanied by other Galion employees.

■■ Upon the above facts, there is presented the frequently troublesome question of assessing whether a foreign corporation has so far extended its operation into the forum state so as to have rendered itself subject to the jurisdiction of the courts of that state. The question is initially one of state law, the pertinent inquiry being whether the local statute as judicially construed is broad enough to encompass the situation. See Pulson et al. v. American Rolling Mill Co., 1st Cir., 1948, 170 F.2d 193. In the most recent New Hampshire case, there appears the following language: "We shall continue to follow the rule laid down in LaBonte both in the spirit as well as the letter to the fullest extent permitted by due process and statutory requirements." Benson v. Brattleboro Retreat, 1960, 103 N.H. 28, 164 A.2d ·560. In the case referred to, LaBonte v. American Mercury Magazine, Inc., & a., 1953, 98 N.H. 163, at page 166, 96 A. 2d 200, at page 202, 38 A.L.R.2d 742, the court said: "Today in determining whether a foreign corporation shall be subject to local process, the theories of implied consent and corporate presence have been discarded in favor of the 'fair play and substantial justice' rule formulated in International Shoe Co. v. [State of] Washington, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95, * * *. That rule is considered more convincing in this jurisdiction than the cases cited by the defendant. Grace v. Procter & Gamble Company, 95 N.H. 74, 76." On page 77 of the Grace case, 57 A.2d 619, on page 621, the court said: "The court will be guided in its findings and ruling by International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95." In the case of W. H. Elliott & Sons Co., Inc. v. Nuodex Products Co., Inc., 1st Cir., 1957, 243 F.2d 116, a matter originating in this court, the two concurring judges expressed the opinion that New Hampshire had not, either by statute or judicial construction, established as a matter of local law any restrictions on the scope of jurisdiction beyond the minimal requirements embraced in the due process clause of the Fourteenth Amendment. Thus the answer to the question as to whether New Hampshire has provided for "bringing the foreign corporation into its courts under the circumstances of the case presented" (Pulson et al. v. American Rolling Mill Co., supra) must be sought in the response to the further question as to whether it can do so consistent with the due process clause.

■ In considering that question, I suggest that two independent areas of activity which relate to the defendant must be examined; those which concern the distributor Hazelton and those which

concern the plaintiff Sanders. It has been urged by the plaintiff that the court consider both these activities as an integral whole, but this view does not accord with fact or logic. The activities of Galion in relation to Sanders were clearly collateral to the mainstream of its business and should be so dealt with which I will now proceed to do.

■ In addressing oneself to the question of whether due process inhibits the service of process upon foreign corporations, one is confronted immediately with the landmark case of International Shoe Co. v. State of Washington et al., 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, the facts of which need not be restated here. Suffice to say that that case marked a departure from older concepts of "implied consent" and "presence" and the introduction of a new test which broadened the powers of the courts of the states to the extent that they could exercise jurisdiction over foreign corporations without violation of the Fourteenth Amendment provided such exercise did not offend "traditional notions of fair play and substantial justice." In order that such exercise be not so offensive, it was required that the foreign corporate defendant have certain minimal contacts within the forum state. To test the presence of such contacts, the court proposed certain criteria to be weighed in deliberation. "Continuous and systematic" activity within the state was said to give rise to "presence" where the liabilities sued on grew out of the activity and in some instances to result in amenability to process in relation to totally distinct matters. (Page 317–318, 66 S.Ct. 154, 90 L.Ed. 95.) An "estimate of the inconveniences" visited upon a corporation forced to defend itself away from "home" was also thought relevant. (Page 317, 66 S.Ct. 154, 90 L.Ed. 95.) The enjoyment by the foreign corporation of the benefits and protection of the laws of the state in which it exercised the privilege of conducting activities was still another factor. (Page 319, 66 S.Ct. 154, 90 L.Ed. 95.) And finally, the fact that the exercise of such privilege might give rise to obligations connected with or arising out of activities within the state was deemed important. (Page 319, 66 S.Ct. 154, 90 L.Ed. 95.)

There seems but little doubt that the activities of Hazelton were "continuous and systematic." While volume is not a determining factor, it may be observed that an annual average of $100,000 business was done over a period of four or five years encompassing the area of dealings between Sanders and the defendant. The crucial problem arises, however, as to whether these activities may fairly be ascribed to Galion for the purposes of this case. In this regard, the above-mentioned case of LaBonte v. American Mercury Magazine, Inc., & a. is of importance. In that case, the Rumford Press, an independent corporation, continuously and systematically printed the American Mercury Magazine in New Hampshire "under orders, instructions and inspections by Mercury." The exceptions of Mercury to the denial of its motion to dismiss were overruled, the court feeling that it would not be offensive to "our traditional conception of fair play and substantial justice" for the state wherein the allegedly libelous matter was "systematically printed and distributed" to assume jurisdiction in a libel action. In so holding, the court was not unmindful of the fact that the cause of action was closely related to the local activities. (98 N.H. page 168, 96 A.2d page 203, 38 A.L.R.2d 742.)

■ In the case at bar, the local corporation is also independent and as Rumford printed other magazines, so it distributed products of other companies. Nonetheless, the situation differs from LaBonte in that the cause of action here sued on is, in my judgment, unrelated to the operations carried on by Hazelton. It might be one thing to say that Galion should be subject to suit at the instance of Hazelton, but it is quite another to say that it may be called upon to answer to this plaintiff in regard to collateral matters. Were this a suit by Hazelton or one of its customers, it might be persuasively argued that the state would

have an interest in protecting local purchasers and that Galion might be reasonably expected to have anticipated that it would be subjected to the jurisdiction of the courts of the state for the purpose of answering complaints by such persons. However, I do not believe that it would comport with "traditional notions of fair play and substantial justice" to hold that Galion, as a result of its dealings with Hazelton, should have foreseen that it was exposing itself to the institution of litigation in respect to matters unconnected with those dealings.

It might also be noted that this type of case differs from one such as the Elliott case wherein one company brokered another's products on a commission basis. See Venus Wheat Wafers, Inc. v. Venus Foods, Inc., D.C.Mass., 1959, 174 F.Supp. 633, 635.

Therefore, inasmuch as it appears that the state law is coextensive with the Fourteenth Amendment, I hold that for purposes of this case Galion was not "transacting business" in this state as a consequence of the Hazelton activities.

We come now to a consideration of the second aspect of this matter concerning the dealings carried on between the parties. In summary, they include: two precontract meetings in this state which may be described as negotiations, the conclusion of two contracts, one of which at least appears to have been made in this state; approximately a dozen or so visits to the state by representatives of Galion to participate in engineering conferences or witness test demonstrations and finally, a number of telephone calls and communications by mail. I do not feel that the research and experimentation carried on by Sanders can be regarded as the activity of Galion. It is true, of course, that Galion employee Roberts issued instructions from time to time in relation to certain technical matters, but I cannot conclude from such fact that the plaintiff was under defendant's control.

While these activities are to be viewed as a whole, it is appropriate to consider first whether the fact that the supplemental agreement was finally executed in this state is sufficient to warrant the conclusion that Galion was transacting business here. The case of McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223, represents the broadest extension of jurisdiction over foreign corporations doing business in the forum state. In that case, a resident of California had taken out a policy of life insurance with an Arizona corporation, the insurance obligations of which were assumed by agreement by the defendant which had its principal place of business in Texas. A reinsurance contract was mailed to the resident in California and there accepted by him. Premiums were mailed from California to the defendant in Texas. The beneficiary recovered judgment on the policy in California where the court based its jurisdiction upon a local statute under which foreign corporations otherwise unamenable to process within the state are made subject to suit on insurance contracts entered into with residents of that state. The Texas courts refused to enforce the judgment, however, on the ground that it was rendered void by the Fourteenth Amendment. The Supreme Court held that California might, consistent with due process, impose a binding judgment upon the defendant and in so doing said at page 223, 78 S.Ct. at page 201, 2 L.Ed.2d 223: "It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State." Taken at face value, that statement might appear to justify the assumption of jurisdiction in the pending action. However, it has been suggested that the case of Hanson, Executrix et al. v. Denckla et al., 1958, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283, has had the effect of limiting the McGee case to the insurance field. Trippe Manufacturing Company v. Spencer Gifts, Inc., 7 Cir., 1959, 270 F.2d 821, 822. In any event, the State of California had evinced a special interest in protecting its citizens in the area there involved. No such comparable evidence of special interest exists in the present case. I do not believe

that a finding of jurisdiction may rest solely on the fact that a contract was executed here by mail.

Plaintiff has urged consideration of Compania De Astral, S. A. v. Boston Metals Co., 1954, 205 Md. 237, 107 A.2d 357, 108 A.2d 372, which upheld the constitutionality of a state statute which subjected foreign corporations to suit at the instance of local residents as to suits arising out of contracts made in Maryland whether or not the foreign corporation was engaged in doing business in that state. While it is true that the court referred to International Shoe and observed that it felt the contacts of the foreign corporation were sufficient to sustain suit against it under that case, it did not discuss the criteria or standards which that decision formulated. The rationale of the Astral holding seems to be that the state which can make the law of the contract may lay claim to the right to administer it on grounds of its interest in affording convenience of litigation to its own citizens in respect to matters arising out of local contracts and its further interest in assuring that the contract will be controlled by applicable law. The case seems to go farther in upholding the statute than the courts have been willing to by judicial construction of broader statutory declarations.

Plaintiff has also cited two other cases. The case of National Gas Appliance Corporation v. A. B. Electrolux, 7th Cir., 1959, 270 F.2d 472, appears to have involved more frequent and lengthy negotiation conferences in the state than are present here. The court seemed to rely particularly upon the fact that the purpose of the visits to the state was to advance the prospects of distributing defendant's products there.

The case of Arco Welding & Machine Works, Inc. v. Terry Contracting, Inc., Superior Court of N. J. Law Division, 1957, 44 N.J.Super. 586, 131 A.2d 316, involved the following fact situation. The defendant, a New York corporation, was authorized to do business in New Jersey and had appointed a registered agent for service of process. After the death of the agent, service was made upon the Secretary of State under a statutory provision that service could be made on such person when the registered agent died, became disqualified, removed from the state, or was otherwise unavailable. Service was upheld under the statute, the court also noting that defendant had never withdrawn its written authority which it had power to do. Having so held, the court, almost as an afterthought, indicated it felt the contract involved in the suit was finalized in New Jersey and then stated: "This cause of action not only made it a New Jersey contract but also constituted a doing of business in New Jersey." There was no discussion or citation of authority.

New Hampshire, as above-mentioned, has adopted the holding of International Shoe and has directed that the lower courts of the state be guided by the "findings" and "rulings" of that case. Considering then the standards there enunciated, it does not seem to me that defendant's activities in relation to Sanders can be fairly characterized as "continuous and systematic." However, International Shoe left open the possibility that occasional acts or even a single act might be sufficient because of their "nature and quality" and the "circumstances of their commission." A consideration of these factors does not in my judgment alter the picture. I am at best doubtful as to whether the activities that have been carried on can be described as "commercial." In the LaBonte case, Chief Justice Kennison said the following, 98 N.H. at page 167, 96 A.2d at page 203: "While the concept of doing business is a legal one, it should bear some relation to the concept of doing business in a commercial sense." The activity carried on by Mercury in that case was essentially the purchase of services as was the Galion activity here. In both instances, activity was caused to take place in the state. However, the activities caused in LaBonte were essential to and contributed directly and immediately toward the distribution of the foreign

corporation's product, some of the profits from which were realized from New Hampshire. The activity carried on in this case bore no such relationship to the sale of graders and rollers.

Still considering the nature of the activity, it might be pointed out that there is no evidence that the state treats this type of situation in a special manner. The contract was clearly one between equals.

Turning to the other standards of International Shoe, it was therein indicated that to the extent that a foreign corporation had exercised the privilege of conducting activities within the forum state, it had enjoyed the benefit and protection of such state's laws. That criterion does not appear to have been adopted by the New Hampshire courts. W. H. Elliott & Sons Co., Inc. v. E. & F. King & Co., Incorporated, D.C.N.H., 1956, 144 F.Supp. 401. Plaintiff suggests that a Galion grader, as well as its operator, enjoyed the benefits and protection of New Hampshire law while present in this state. But such enjoyment was not the result of the exercise of any privilege which gave rise to obligations here sued upon nor is the activity of such a nature as to establish sufficient contact with the state.

██ An "estimate of the inconveniences" does not in my judgment result in the determination that an oppressive burden would be visited upon the defendant by requiring it to defend here. Modern travel facilities are available and defendant's representatives have come here on several occasions. However, it cannot be said to follow from this conclusion that jurisdiction should be entertained. We are concerned not merely with convenience of litigation, but with the power of a state to act. As was pointed out in Hanson v. Denckla, supra, "However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him. See International Shoe Co. v. State of Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95."

While it is true that the breach of contract alleged in the complaint may well have occurred elsewhere, the obligations sued on arose out of a contract entered into in this state.

The question is a close one and while I am not unmindful of the ever increasing trend toward the expansion of the limits of jurisdiction, I feel that, in view of the nature and limited amount of activity on the part of the defendant, maintenance of this suit would offend "traditional notions of fair play and substantial justice" and that jurisdiction is, therefore, lacking. Having so concluded, it becomes unnecessary to deal with defendant's other contentions.

The motion is granted, the action is dismissed, and an order will be so entered.