**SANDERS ASSOCIATES, INC.,**
**Plaintiff, Appellant,**

**v.**

**The GALION IRON WORKS & MANUFACTURING COMPANY, Defendant,**
**Appellee.**

**No. 5980.**

United States Court of Appeals
First Circuit.

July 18, 1962.

Robert B. Hamblett, Nashua, N. H., with whom Hamblett, Kerrigan & Hamblett. Nashua, N. H., was on brief, for appellant.

Samuel H. Porter, Columbus, Ohio, with whom Lawrence D. Stanley, Columbus, Ohio, Irving H. Soden, Concord, N. H., Porter, Stanley, Treffinger & Platt, Columbus, Ohio, and Sulloway, Hollis, Godfrey & Soden, Concord, N. H., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from an order of the United States District Court for the District of New Hampshire dismissing for lack of jurisdiction plaintiff's action for breach of contract against the defendant foreign corporation on the ground that defendant's activities in New Hampshire did not establish a sufficient nexus with that state to render it amenable to suit by plaintiff.

This proceeding involves three principal parties. Plaintiff-appellant, Sanders Associates, Inc., (hereinafter called "Sanders") is a Delaware corporation with its principal place of business in Nashua, New Hampshire. Plaintiff is engaged in the invention, design and manufacture of electronic and hydraulic devices for a wide variety of uses.

Defendant-appellee, the Galion Iron Works & Manufacturing Company (hereinafter called "Galion"), is an Ohio corporation with its principal place of business in Galion, Ohio. Defendant is engaged in the manufacturing and sale of motor graders and road rollers.

R. G. Hazelton Company, Inc. (hereinafter called "Hazelton") is the exclusive distributor for Galion in New Hampshire. Its activities on behalf of Galion are governed by an extensive working agreement, some of the details of which will be discussed below.

Plaintiff's action for breach of contract stemmed from the following events. Following two preliminary conferences held at Nashua, New Hampshire, on May 9, 1957 and June 12, 1957 an agreement was executed on July 22, 1957 under the terms of which Galion placed an order with Sanders for development of a grader attachment (attachable to the regular Galion grader) by which the slope of the grader blade would adjust automatically to compensate for variations in the terrain under construction. Galion wanted a control system that would automatically sense true vertical and control the grader blade to maintain a preset level or grade, even over irregular terrain. Such an attachment would

simplify the operator's job and give a more accurate finish.

On November 26, 1957 a second agreement denominated as "supplemental" was executed. Under the terms of this instrument Sanders agreed to construct two "preproduction" models which were to be field tested by Galion to insure that they conformed with the specifications which Sanders had prepared. Upon the completion of five hundred hours of satisfactory testing by Galion, Sanders was to receive payment.

The research and developmental nature of this project required extensive liaison between Galion and Sanders. In the words of the district court:

"The nature of the agreement was such as to require frequent consultation between the parties and such consultation was largely carried out in New Hampshire. The majority of the meetings were engineering conferences generally between Galion's project engineer and employees of Sanders at Nashua. At other times, several officials of Galion came into the state to confer and witness demonstrations of the device, mounted on a Galion grader. It appears that such a grader was located in New Hampshire from August, 1957, until June, 1958." 203 F.Supp. 522 at 524.

Galion's contacts with Sanders in New Hampshire stemmed from the foregoing implementation of this agreement and, as noted, the instant action arose from an alleged breach of the contract.

Galion's other contacts with the State of New Hampshire arose from its dealings with Hazelton. Hazelton is one of the largest distributors of heavy construction equipment in New Hampshire, marketing the products and machinery of approximately fifteen manufacturers.

In 1955 Hazelton became Galion's exclusive New Hampshire distributor and has continued in that capacity down through the date of the present action. During this period, 1955–1961, Hazelton sold about $500,000 worth of Galion's products in New Hampshire and supplied an estimated 20 to 25 per cent of the New Hampshire grader market and about 25 per cent of the New Hampshire roller market. All of Galion's products reaching New Hampshire were sold to Hazelton, f. o. b. Galion, Ohio.

The terms of the exclusive distributorship agreement signed by Hazelton provided, *inter alia*, as follows: Hazelton was granted the exclusive right to market Galion's equipment in New Hampshire territory subject to two important exceptions. Galion reserved the right to sell its equipment directly to the United States and State Highways Departments. The agreement also contained an express reservation to other distributors of the right to sell to companies having a place of business in another distributor's territory, notwithstanding "the fact that the equipment is to be delivered into and initially used in" Hazelton's territory. Hazelton was prohibited from soliciting outside the State of New Hampshire or from accepting orders from outside its territory without the other distributor's consent and the consent of Galion. There was a similar proscription on all export orders. Finally, under the terms of the agreement, Hazelton could not engage directly or indirectly in the marketing and sale or procurement of sales of any new motor graders or road rollers other than those made by Galion. As found by the district court, Hazelton could handle no other new equipment "that competed with Galion products." 203 F.Supp. 522 at 524.

Galion furnished Hazelton a list of prices and available discounts. Under the agreement Hazelton consented to the insertion of prices in orders received by Galion and agreed that Hazelton would be bound "thereby as if such details, prices, etc. had been contained in the order at the time he signed it."

Under paragraph 6 of the agreement Hazelton agreed to keep on hand not less than three graders and two rollers as well as a complete supply of replacement parts; to use "its best efforts in the promotion and sale in its territory and dili-

gently canvass and regularly circularize with literature supplied by [Galion], the town, city, county and contractor trade in such territory;" to provide adequate sales, storage and service facilities; to maintain in good condition, in conspicuous and appropriate location inside and outside of its place of business, signs identifying Hazelton as a distributor of Galion's equipment; to engage, train and maintain sales, service, parts, handling and accountant personnel sufficient to obtain a reasonable share of the sales possibilities for motor graders and road rollers in the territory; to promptly and efficiently service the equipment in its territory and to maintain proper and adequate accounting records; and to comply with Galion's policies in effect from time to time concerning delivery service and on service after delivery on the equipment embraced by the agreement.

Under paragraph 7 of the agreement Hazelton was obliged to "assume complete responsibility for the proper inspection and assembly of the equipment and deliver the same to its vendee in good operating condition; train the operators and mechanics of its vendee to operate, lubricate and maintain such equipment correctly; inspect the equipment free of charge thirty (30) days (as nearly as practicable) after delivery to its vendee; again inspect the equipment free of charge five (5) months (as nearly as practicable) after delivery to its vendee; and furnish to the Company a delivery report, 30-day inspection report and 5-month inspection report on forms furnished by the Company, signed by the Distributor and an authorized representative of its vendee. * * * "

Galion gave a six months warranty against defective material or workmanship and, as found by the district court, "Hazelton serviced any complaints and apparently bore the labor costs involved." 203 F.Supp. 522 at 524.

Hazelton was required to furnish Galion a monthly sales report indicting sales for the preceding thirty days, inventory, unfilled orders, and projections of future sales. Hazelton contributed to advertising programs of Galion appearing in trade journals circulated in New Hampshire. Upon the termination of the agreement and under specified conditions, Galion agreed to repurchase from Hazelton all new, current, unused and salable service parts.

There was continuing assistance and personal contact between Galion and Hazelton. Galion furnished training services for Hazelton's salesmen and made available to Hazelton a Galion airplane by which prospective New Hampshire customers could be flown to Galion's plant in Ohio.

One David Gillespie, Galion's "district representative," was in periodic personal contact in New Hampshire with Hazelton and, as noted, monitored its monthly sales performance. His function was to insure that "Galion has its share of the New Hampshire market," and his liaison with Hazelton was aimed at fostering this objective.

On these facts the issue is raised whether the Galion corporation could be subjected to suit in the State of New Hampshire and accordingly, in a United States district court where, as here, there exists diversity of citizenship. As the trial judge correctly noted, in this class of case two questions must be anwered.

In Pulson v. American Rolling Mill Co., 170 F.2d 193, 194 (1 Cir.1948), this court indicated the scope of that dual inquiry thusly:

"There are two parts to the question whether a foreign corporation can be held subject to a suit within a state. The first is a question of state law: has the state provided for bringing the foreign corporation into its courts under the circumstances of the case presented? There is nothing to compel a state to exercise jurisdiction over a foreign corporation unless it chooses to do so, and the extent to which it so chooses is a matter for the law of the state as made by its legislature. If the state has purported to exercise jurisdic-

tion over the foreign corporation, then the question may arise whether such attempt violates the due process clause or the interstate commerce clause of the federal constitution. Const. art. 1, § 8, cl. 3; Amend. 14. This is a federal question and, of course, the state authorities are not controlling. But it is a question which is not reached for decision until it is found that the State statute is broad enough to assert jurisdiction over the defendant in a particular situation."

We had occasion to consider the pertinent New Hampshire statute and the relevant state cases in W. H. Elliott & Sons Co. v. Nuodex Products Co., 243 F.2d 116 (1 Cir.1957), cert. den., 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38, and there concluded that New Hampshire placed no constrictions on its *in personam* jurisdiction *vis a vis* foreign corporations. On the contrary, now Chief Judge Woodbury, concurring, specifically pointed out that it was the objective of the local statute to exercise jurisdiction to the full extent of the constitutional limit. We adhere to that view.

Thus, unfettered by local statutory inhibitions, the question then arises as to whether—consistent with the due process clause of the Fourteenth Amendment—Galion may be subjected to New Hampshire *in personam* jurisdiction by Sanders. The trial court held that Galion could not. For reasons developed below, we disagree with that conclusion.

The district judge, in resolving the present issue, sought to compartmentalize the activities of Galion *vis a vis* Hazelton and *vis a vis* Sanders. Thus he stated:

"In considering that question, I suggest that two independent areas of activity which relate to the defendant must be examined; those which concern the distributor Hazelton and those which concern the plaintiff Sanders. It has been urged by the plaintiff that the court consider both these activities as an integral whole, but this view does not accord with fact or logic. The activities of Galion in relation to Sanders were clearly collateral to the mainstream of its business and should be so dealt with which I will now proceed to do." 203 F.Supp. 525–526.

Thereafter after analyzing the dealings between Sanders and Galion (arising from the developmental agreement), the court concluded that these activities did not of themselves rise to a level sufficient to render Galion amenable to service of process in New Hampshire. The court then turned to the relationship obtaining between Hazelton and Galion. Here the district court concluded that while the scope of Galion's activities might validly permit a suit by Hazelton, again the activities were not such as would permit Galion to be sued by a third party (Sanders) on a matter collateral to the "mainstream" of intercourse between Galion and Hazelton. In the language of the trial judge:

"* * * It might be one thing to say that Galion should be subject to suit at the instance of Hazelton, but it is quite another to say that it may be called upon to answer to this plaintiff in regard to collateral matters. Were this a suit by Hazelton or one of its customers, it might be persuasively argued that the state would have an interest in protecting local purchasers and that Galion might be reasonably expected to have anticipated that it would be subjected to the jurisdiction of the courts of the state for the purpose of answering complaints by such persons. However, I do not believe that it would comport with 'traditional notions of fair play and substantial justice' to hold that Galion, as a result of its dealings with Hazelton, should have foreseen that it was exposing itself to the institution of litigation in respect to matters unconnected with those dealings." Id., at 526–527.

We may pretermit considerations as to the correctness of the district court's

*in vacuo* approach to Galion's activities relative to Sanders and Hazelton as well as the potential jurisdictional ramifications stemming exclusively from the Sanders-Galion relationship. For it is our belief that Galion so injected and impressed itself upon the State of New Hampshire through its distributor Hazelton as to render it liable to suit on any and all claims otherwise properly brought in the New Hampshire courts; whether or not these suits be "unconnected" with the central course of conduct involving Galion and Hazelton.

■ Any resolution of an issue of this kind starts with International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). That case, in assaying the question of state court jurisdiction over foreign corporations eschewed the "consent" and "presence" theories of jurisdiction formerly in vogue in favor of a new standard. Under that standard, courts were to inquire as to whether the foreign corporation had such "minimum contacts" with the forum that the maintenance of the action would not offend "traditional notions of fair play and substantial justice." The Court said that the question of whether due process is satisfied turns on the " * * * quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure" Id., at 319, 66 S.Ct. at 159. In short, jurisdiction is to turn on a qualitative analysis of the nature and kind of a defendant's local activities.

■ It is our belief that a qualitative analysis of Galion's activities in New Hampshire compels the conclusion that it had established "sufficient contacts or ties" with that state "to make it reasonable and just, according to our traditional conception of fair play and substantial justice, to permit the state to enforce the obligations which appellant has incurred there." Id., at 320, 66 S.Ct. 160.

While it has been held that the mere sale of goods to a local distributor will not in itself provide a basis of jurisdiction over a foreign corporation, Schmidt

v. Esquire, Inc., 210 F.2d 908 (7 Cir. 1954); Favell-Utley Realty Co. v. Harbor Plywood Corp., 94 F.Supp. 96 (N.D. Cal.1950), the degree of control which Galion maintained over Hazelton removes their relationship from that line of cases.

Although Hazelton technically acquired complete title to a piece of Galion equipment in Ohio, f. o. b., it was anything but free in regard to what it might thereafter do with that equipment. It was neither the complete captain of its marketing fate in the initial sale of the goods or for a considerable time thereafter. Under the terms of its distributorship agreement Hazelton could not sell this equipment to a federal highway department without the express approval of Galion. It could not sell to a state highway department without the express approval of Galion. It could not sell outside its territory. It could not export the equipment. It could not sell other new equipment performing functions similar to Galion's. All of these provisions (together with the corollary provision that other distributors might not otherwise sell or solicit in Hazelton's territory) demonstrate the very meaningful and effective control which Galion exercised over the New Hampshire market in general and over Hazelton in particular, a leverage which would scarcely seem to comport with the surface appearance of "an independent distributor."

Moreover, Galion reserved the right to establish prices and discounts and Hazelton agreed to be bound "thereby as if such * * * prices had been contained in the order at the time [it was signed]."

Galion dictated the size of Hazelton's inventory and the extent of its replacement parts supply. It molded Hazelton's advertising policies and promotional policy and dictated the use of Galion signs on "conspicuous and appropriate" places on the Hazelton outlet. It required Hazelton to hire men skillful in sales, service, and parts handling of its equipment.

After Hazelton sold a piece of equipment its obligations flowing from the

Galion distributorship agreement were not over. Hazelton had to promptly and efficiently service the Galion equipment in its territories. Hazelton was obliged under the agreement to train the mechanics and operators of the customers to which it sold a particular piece of equipment. It was required to inspect the customer's equipment free of charge on both the first and fifth month after the date of sale and to furnish Galion with reports covering both inspections. In addition, Hazelton was required to submit estimates of future sales, records of sales and inventory reports.

Galion gives a six months warranty against defective parts or workmanship. Hazelton understood this to be a warranty by Galion to Hazelton's vendee. Significantly as the court found, "Hazelton serviced any complaints and apparently bore the labor costs involved."

Finally, there is the pattern of continuing assistance between Galion and Hazelton manifested by such items as the ready availability of the Galion airplane to fly customers to the Galion plant in Ohio.

In sum, we believe that a consideration of all the foregoing factors compels the conclusion that the manifested activities of Galion—albeit accomplished through the "independent" distributor Hazelton—makes it eminently reasonable that Galion here should be subject to service of process within the State of New Hampshire.

Surely there would be no serious question if Galion had established its own branch outlet in New Hampshire and staffed it with its own personnel, whose work was to perform functions coextensive with those now handled by Hazelton, that it would be "doing business" within the state sufficient to satisfy the minimum constitutional requirements of jurisdiction. However, in the instant case, Galion through control of the retail price, requirements as to the maintenance of a sales force, proscription against selling the comparable products of competitors, specifications as to the maintenance of a service department and display area, insured a diligence in the marketing of Galion's products which compels the conclusion that, when all was said and done, Galion had actually obtained all the economic benefits that could have been derived from establishing its own distribution outlet in New Hampshire and derived this economic benefit without incurring the burden of capital outlay to establish its own distribution force. We believe that the degree of control and leverage which it exercised over Hazelton negates any due process objection on the face of this record.

In this connection the language of the Fourth Circuit in Kahn v. Maico Company, 216 F.2d 233 (1954), is particularly appropriate. The question in that case was whether a foreign corporation was "doing business" within the meaning of the local Maryland statute so as to render it amenable to service of process. Although that case involved a suit by a Maryland partnership against the nonresident corporation for breach of its franchise contract with defendant (and thus was an action "connected" with the business of the defendant), we believe that its rationale is equally applicable here.

"* * * Upon the evidence taken as a whole, however, it is impossible to escape the conclusion that through the plaintiffs, defendant was advertising and selling its hearing aids in the State of Maryland, that the business was in effect done in defendant's name and that it was as completely controlled by defendant as it would have been if plaintiffs had been mere selling agents. Furthermore, there can be no doubt but that defendant actually participated in the sales made by plaintiffs, since the guaranty given in connection with the sale of a hearing aid was a part of the sale, and in making the guaranty the plaintiffs were unquestionably acting as agents of defendant. They were also acting as agents of defendant in adjusting complaints made under the guarantees.

"On these facts, we think that defendant was clearly doing business in the state within the meaning of the statute. In La Porte Heinekamp Motor Co. v. Ford Motor Co., D.C., 24 F.2d 861, and the very recent case of Thomas v. Hudson Sales Corp., [204] Md. [450,] 105 A.2d 225, 228, in both of which jurisdiction was sustained, it was pointed out that, while it did not constitute doing business within the state for a foreign corporation to make sales outside the state to distributors who carried on business therein, even though a district superintendent might visit them and advise with respect to selling policies, nevertheless such foreign corporation would be held to be doing business within the state if it went beyond this pattern and exercised substantial control over the business of the local distributor. Here the defendant not only controlled the business policies of the distributor, but also regulated the details of the business almost as completely as if the distributor had been an agent in all repects. No one would contend that what was done did not constitute doing business by defendant if plaintiffs had been compensated on a commission basis instead of by discounts allowed from the sale price which defendant fixed; but the method of compensating the one who carries on the business cannot defeat jurisdiction when it appears that it was in reality defendant's business that was being carried on.

"The case is not one where sporadic or occasional transactions are relied on to establish the doing of business within the state; but one in which it is shown that business of defendant was regularly carried on. * * *" Id., at 235.

Moreover, the Supreme Judicial Court of Massachusetts has consistently held that where the agents of a foreign corporation set about investigating and servicing complaints arising from the sale of goods of the foreign corporation that such activity will be sufficient to bring the corporation within the local "doing business statute." These cases have arisen both in the context of claims "connected" and "unconnected" with the mainstream of defendant's business in the state.

In Wyshak v. Anaconda Copper Mining Co., 328 Mass. 219, 103 N.E.2d 230 (1952), the court stated:

" * * * The investigation of complaints is an important factor in the completion of business transactions, an indispensable aid to performance and a conservor of good will. Investigation and correspondence as to complaints partake of activity outside the simple solicitation of business. * * *" Id., 103 N.E.2d at 232.

This result was followed in Jet Mfg. Co. v. Sanford Ink Co., 330 Mass. 173, 112 N.E.2d 252 (1953), where the Massachusetts court stated:

" * * * Here again there was more than mere solicitation. There was the investigation of complaints by a permanent representative resident in the Commonwealth, who was empowered to do whatever was incidental to selling and fostering good relations with the trade. We are unable to see where the functions of this representative were substantially different from the handling of complaints and the 'promotional work' which were present in the Wyshak case. That it is not necessary to maintain an office in order to become subject to the jurisdiction of this Commonwealth is manifest from the language of § 38." Id., 112 N.E.2d at 254.

In the instant case the district court found that Hazelton serviced any complaints stemming from the sale of the Galion equipment. While, as the trial judge noted, Hazelton apparently bore the cost of this activity, the activity was undoubtedly calculated to inure to Galion's benefit and undertaken at its direction.

Upon a consideration of the record as a whole, we believe that Galion was "doing business" within the State of New Hampshire and that its contacts with the forum were of sufficient sweep and scope to make it eminently reasonable that it be amenable to suit in that jurisdiction both as to claims related and unrelated to the "mainstream" of its commercial intercourse within the state.

Judgment will be entered vacating the judgment of the district court and remanding the action to that court for further proceedings not inconsistent herewith.